Powers v. The People.

---

### John T. Powers v. The People of the State of Illinois.
#### Gen. No. 11,150.

1. CONTEMPT—*when, civil.* When a person fails or refuses to do something which he has been ordered to do for the benefit of the opposite party and he is punished therefor, either by imprisonment or fine, the contempt is civil.

2. CONTEMPT—*when, criminal.* A criminal contempt embraces all things committed against the majesty of the law or the dignity of the court, and the primary purpose of their punishment is the vindication of public authority.

3. CONTEMPT—*what essential to infliction of punishment for criminal.* Before inflicting any punishment upon one charged with a criminal contempt alleged to have been committed out of the presence of the court, it should clearly appear that such person was actuated by some malevolent intention to lower or assail the dignity of the court, or wilfully or knowingly interfered with the administration of justice.

Contempt proceeding. Appeal from the Superior Court of Cook County; the Hon. JESSE HOLDOM, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1903. Reversed. Opinion filed June 3, 1904.

**Statement by the Court.** This is an appeal from an order of the Superior Court of Cook County finding appellant guilty of contempt of court, fining him fifty dollars and ordering him to be imprisoned in the county jail until the fine is paid, not exceeding ten days.

On September 25, 1902, John G. Hemmer filed his bill in chancery against appellant alleging that on the 8th of

the same month they had formed a partnership, to continue at will, in the business of publishing "The Athlete," a weekly newspaper devoted to athletics; that each partner was to share equally the profits and losses; that said business had been carried on from said 8th of September until the filing of the bill; that defendant (appellant) has been collecting partnership debts and converting them to his own use, wherefore complainant desires to dissolve the partnership; that its assets consist of office furniture and outstanding accounts, worth about $300, with liabilities of the same amount; that defendant is insolvent and complainant believes he is about to dispose of the assets, collect the accounts and convert them to his own use. Upon the filing of the bill a receiver was appointed of the assets and effects of the partnership including the paper known as "The Athlete," and on October 23, 1902, he, pursuant to an order of court, sold at public sale to complainant all the assets of the partnership for the sum of $105.

October 16, 1902, appellant published the first number of "The Chicago Sporting News, an illustrated weekly devoted to legitimate sport," containing an editorial written by him which furnished the foundation for the contempt proceeding. The passages relied upon as inculpatory are as follows:

" In making its bow to the public and especially to that portion of it which is interested in amateur and clean, legitimate sports generally, The Chicago Sporting News wishes to announce that its policy will be in the main that pursued by The Athlete, of which it is the successor. The new paper * * * will be issued by the former publisher and editor of The Athlete, and like the latter it will always be found in line for everything that will advance, encourage and promote the interests of amateur sport * * * of the kind of exercise offered by base ball, bowling, boxing, billiards and other legitimate sports. A word as to the passage of The Athlete. An interest was obtained in that publication by John G. Hemmer. * * * The Athlete had devoted especial energy and much of its space to base ball as played by amateurs during the season just closing. Mr. Hemmer * * * undertook to dictate an entirely new policy. He * * * under-

took to say that The Athlete should keep out of the bowling field altogether or only cover it in such way as he cared to dictate. The Chicago Sporting News * * * will be issued every Thursday, and as a beginning and to show the right spirit, it will be sent to all paid-up subscribers whose names are on the old list of The Athlete. It asks for the support of all who so generously supported its predecessor."

On the day succeeding the publication of the editorial complainant caused appellant to be notified of an application for a rule on him to show cause why he should not be attached for contempt in interfering with the assets in the receiver's possession, and on the following day the rule was entered upon petition filed. In his answer thereto appellant states *inter alia* that since the appointment of the receiver "The Athlete" has not been issued, and no attempt has been made to issue it. In an affidavit subsequently filed by appellant he says that "he has not now, and never has had, any intention whatsoever of disobeying any order or direction of this court."

Upon the hearing of a motion October 24, 1902, to dismiss the petition, the court announced that it considered those parts of the editorial stating that The Chicago Sporting News was the successor of The Athlete, and that, in substance, the mailing list of the latter was used in sending out the former, an interference with the receiver, calculated to depreciate the assets in his hands, and that it, the court, would consider, upon appellant's motion to be discharged from the rule, an editorial retraxit to be published in the next issue of The Sporting News. Accordingly, the next issue contained the following:

"The Chicago Sporting News is an independent weekly publication, and has for its editor John T. Powers, the former editor and publisher of The Athlete, but has no connection with the latter paper. The Chicago Sporting News will be sent to all paid-up subscribers of The Athlete who will send their names and addresses to this office. The statement in our first issue that it was the successor of The Athlete was an inadvertent mistake."

The court had also verbally required appellant to publish

the fact that The Athlete was in the hands of a receiver and to submit to it a proof of the article before publishing the same, but this appellant did not do.

November 17, 1902, a final order was entered finding "said Powers has interfered with the assets lately in the hands of the receiver in this cause," and that he "is guilty of contempt of this court by reason of publishing aforesaid article."

VINCENT G. GALLAGHER and LEONARD FISKE, for appellant.

CHURCH, McMURDY & SHERMAN, for appellee; W. A. BITHER, of counsel.

MR. JUSTICE STEIN delivered the opinion of the court.

Proceedings for contempts are classified as civil and criminal. When a person fails or refuses to do something which he has been ordered to do for the benefit of the opposite party, and he is punished therefor either by imprisonment or fine, the contempt is a civil one. A criminal contempt embraces all acts committed against the majesty of the law or the dignity of the court, and the primary purpose of their punishment is the vindication of public authority. People v. Diedrich, 141 Ill. 665; Oster v. People, 192 Ill. 473; Thompson v. Penn. R. R. Co., 48 N. J. Eq. 105; 7 A. & E. Ency. of Law, 2nd ed., 28. As in Oster v. People, *supra*, the purpose of the present proceeding "was not to enforce any act for the benefit of the creditors of the said firm or to advance the private rights of any such creditor, but to vindicate the authority and dignity of the court. The proceeding was punitive and for the purpose of punishing" appellant. It "was criminal in its nature." Section 280 of our Criminal Code provides that "a criminal offense consists in a violation of a public law in the commission of which there shall be a union or joint operation of act and intention, or criminal negligence." Before inflicting any punishment on appellant, it should, therefore, clearly appear, inasmuch as the act constituting the alleged contempt

occurred out of the presence of the court, that he was actuated by some malevolent intention to lower or assail the dignity of the court, or wilfully and knowingly interfered with the administration of justice. Even in civil contempts there must be an intent to do wrong or a wilful refusal to comply with the order of the court. Where a party is attached for failure to pay alimony he may show that his disobedience was not wilful, but due to pecuniary inability or some other misfortune. O'Callaghan v. O'Callaghan, 69 Ill. 552; Dinet v. People, 73 Ill. 183. In Dines v. The People, 39 Ill. App. 565, which was an information for contempt against the clerk of the court in destroying ballots in his custody in violation of the court's order to preserve them, it is said: "Plaintiff in error might be presumed to know the orders and proceedings of the court of which he is clerk in so far as any person might be damaged by reason of his ignorance, and it may be that in such cases he would not be allowed to plead his ignorance; but in a proceeding like the present for contempt, there must exist a wilful intention to disobey or obstruct the orders of the court. In other words, there must be an intention to do wrong." In Hughson v. The People, 91 Ill. App. 396, it was held that the power to punish for contempt cannot be properly exercised where the disobedience of a decree is not wilful and does not clearly appear to have arisen from an intent to set at naught the same or bid defiance thereto.

That in a technical sense the publication of the article complained of was an interference with the partnership assets in the hands of the court through its receiver may be conceded; but it was so only in an indirect and remote sort of way. The Athlete died an early death with the filing of the bill, and the receiver made no attempt to revive it. Under such circumstances it was a most natural thing for appellant as a means of making a living to engage in the enterprise of publishing a similar newspaper, to call it the successor of the defunct one, and to announce that "it will be sent to all paid-up subscribers whose names are on the old list of The Athlete." There is nothing in the

proof to show that he was aware or had any reason for believing that his acts constituted or might be considered an interference with the functions of the receiver or the assets in his hands. For aught that appears he wrote the editorial and began the new enterprise in good faith, believing he had a right so to do, and without any wrongful intention whatever. In the course of the proceeding he expressly disavowed under oath all intention of disobeying "any order or direction of this court," and there is no proof to the contrary. In compliance with the suggestions of the court, he published a retraxit calculated to remove all erroneous impressions that might have arisen from the publication of the article in question. His acts resulted in no harm or damage to any one, and though technically improper, do not call for or deserve punishment. A court should not cause inconvenience or loss to any one subject to its jurisdiction because of some mistake or inadvertence on his part, even if there was, in a legal sense, interference with its jurisdiction.

As early as 1842 Mr. Justice Breese in Stuart v. The People, 3 Scam. 395, uttered these memorable words : " It (the power to punish for contempt of court) may be so frequently exercised as to destroy that moral influence which is their best possession, until finally the administration of justice is brought into disrepute. Respect to courts cannot be compelled; it is the voluntary tribute of the public to worth, virtue and intelligence; and while they are found upon the judgment seat, so long and no longer will they retain the public confidence. * * * It is at best an arbitrary power and should only be exercised on the preservative and not on the vindictive principle. It is not a jewel of the court to be admired and prized, but a rod rather, and most potent when rarely used."

The order appealed from is reversed.

*Reversed.*