(No. 19508.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* AMANTE RONGETTI.—(WM. SCOTT STEWART, Plaintiff in Error.)

*Opinion filed April 23, 1931—Rehearing denied June 3, 1931.*

WM. SCOTT STEWART, *pro se.*

OSCAR E. CARLSTROM, Attorney General, JOHN A. SWANSON, State's Attorney, and JAMES B. SEARCY, (EDWARD E. WILSON, HENRY T. CHACE, JR., JOHN HOLMAN, and HENRY E. AYERS, of counsel,) for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiff in error, Wm. Scott Stewart, was adjudged guilty of a direct contempt of court in the criminal court of Cook county and sentenced to imprisonment in the jail of that county for three months. The judgment was affirmed by the Appellate Court for the First District, and the case comes to this court upon a writ of error.

The alleged direct contempts of court occurred during the trial of Dr. Amante Rongetti on an indictment charging him with murder by abortion. The judgment of conviction in that case was reversed by this court. (*People* v. *Rongetti,* 331 Ill. 581.) The trial judge advanced the cause for trial from the 27th to the 20th day of February, 1928,

over the objection of the defendant. On this point this court said: "The order of the court allowing the motion to advance the cause indicates that the State's attorney had stated that an attempt had been made to intimidate witnesses for the People, and that for that reason the motion to advance the cause was filed. No such statement appears in the record and no affidavit in support of such a statement was filed. * * * The objection to advancing the case was overruled. This was error. Plaintiff in error should have been given a reasonable opportunity to prepare for defense after receiving a list of witnesses from the State. It was unreasonable and unfair to expect him to proceed to trial within four days after receiving notice of a motion to advance the cause, particularly when the records of the hospital were in custody of the State and a part of the witnesses were under the control of the State's attorney. While a motion to advance the cause is addressed to the sound discretion of the court, it was an abuse of discretion to force plaintiff in error to trial after the delay on the part of the State's attorney in furnishing a list of witnesses under the situation as here shown. There was no showing in the record sufficient to justify the advancement of the cause." The conduct of the trial judge during the trial was very prejudicial to the rights of the defendant. On this point it is said in the opinion of this court: "The record in the case contains many instances of interruptions by the court in the examination of witnesses by plaintiff in error's counsel, cross-examination by the court of witnesses for plaintiff in error, and remarks made by the court prejudicial to plaintiff in error. * * * The attitude of the trial court in examining witnesses, in refusing to give an opportunity to counsel for plaintiff in error to state his objections, the manner in which rulings adverse to counsel for plaintiff in error were given, together with numerous errors on the admission of testimony, force this court to the conviction that plaintiff in error has not had a fair trial."

There are embodied in the order adjudging plaintiff in error guilty of contempt, findings of fact as to matters that occurred out of as well as in the presence of the court, and in the record, as a part of the order, there is a certificate of evidence heard by the court in an investigation conducted by the judge before entering the order. For a complete understanding of the case it is necessary to set out a substantial part of the facts and circumstances leading up to the alleged contempts, as shown by the record made by the court in this case.

As we understand the record, the trial judge charges plaintiff in error with five direct contempts, three of which occurred on February 21 and one each on February 23 and on March 23, 1928, and in addition thereto charges him with a number of acts out of court which the judge considered as contempts of court. The three alleged direct contempts committed on February 21 were: (1) Plaintiff in error entered his appearance as attorney for Lorraine Irwin, one of the witnesses for the State in the Rongetti case, without appointment by the court and without authority from the witness; (2) plaintiff in error charged the court with attempting to coerce the witness Lorraine Irwin; and (3) advised the witness not to answer a question asked her by the court. The facts and circumstances leading up to the three alleged direct contempts of court on February 21 and those relied upon as showing such contempts as they appear from the record made up by the trial court in this contempt case, are, in part, substantially as follows:

On February 2, 1928, plaintiff in error entered his appearance as attorney for Dr. Amante Rongetti in the case of *People* v. *Rongetti, supra.* On February 20 the selection of a jury for the trial of that case was begun. When court adjourned at noon plaintiff in error was informed by a bailiff that Lorraine Irwin, one of the witnesses for the State, wanted to speak to him. He had a short talk with Miss Irwin and then went to his office. When court con-

vened in the afternoon the assistant State's attorney in charge of the case informed the court that Miss Irwin had told him that she would rather commit perjury than see Rongetti "go to the electric chair." The court held an investigation out of the presence of the jury, at which the following facts were brought out: Miss Irwin had received, some time about the first of January, 1928, an anonymous letter post-marked December 30, 1927, threatening her with prosecution and possible violence if she testified against Rongetti, and, as she stated, she had been later approached by two men, one of whom was armed with a gun, and threatened with death if she testified against Rongetti. On the evening of February 19, 1928, she called on the telephone Louis Paynter, an acquaintance of hers who was employed as a fireman at one of the public schools in Chicago, and requested him to meet her at the court room the following day. It appeared that Paynter had been formerly employed as an investigator in the State's attorney's office of Cook county at the time plaintiff in error was connected with that office as assistant State's attorney and that plaintiff in error had consulted with him at the time jurors were being examined that morning. When court adjourned at noon, February 20, 1928, Paynter held a short conversation with Miss Irwin in the corridor of the court house and agreed to meet her later at 175 West Washington street. Paynter then went to the office of plaintiff in error in the Chicago Temple building, at 77 West Washington street, and from there to 175 West Washington street, where he met Miss Irwin in the lobby of that building and had a conversation with her. He and Miss Irwin left the building and started to get into a taxicab when a police officer took Miss Irwin in custody and took her back to the court house. Both Paynter and Miss Irwin stated that their conversation had no relation to the case on trial, but the court ordered Paynter held for contempt of court. Miss Irwin stated that she had no intention of leaving the jurisdiction of the court

and that she had no fear of the people who had threatened her and did not want protection. The court ordered her put in the custody of a police matron, saying: "I don't know that I have any power to put her in the custody of a matron. Even in the absence of having power I will do it and see if some other judge by *habeas corpus* will take her out of that custody. I have no power over her that I know of but I am willing to direct a matron to take care of her, and the only way they can disturb that custody is by *habeas corpus,* and then let he who is willing to, take the responsibility of turning her over to the people who are trying to bump her off."

On the evening of February 20, 1928, Lucille Altier, formerly a nurse at Rongetti's hospital, went to a lawyer in the Chicago Temple building and retained him to sue out a writ of *habeas corpus* for Miss Irwin, and she signed and swore to the petition for the writ by the name Marie Russell. The petition was filed before Judge Gemmill, of the superior court of Cook county, and the writ was issued, returnable at two o'clock P. M. on February 21, 1928. On the afternoon of that day the judge before whom the Rongetti case was being tried learned of the issuance of the writ of *habeas corpus* and that it was returnable at two o'clock that afternoon, and the following took place out of the presence of the jury:

The court: "Have you a subpœna, Mr. Clerk, for Lorraine Irwin?

The clerk: "Yes; right here, your honor.

The court: "Does it show service?

The clerk: "Yes, your honor.

The court: "Is Lorraine Irwin in court?

A voice: "Yes.

The court: "Step up with the matron. Do you object to being in the custody of the matron?

Miss Irwin: "Yes.

The court: "You do?

Miss Irwin: "I do.

The court: "You realize that you are under subpœna of this court to be present as a witness and that the case is now on trial?

Miss Irwin: "Yes.

The court: "You realize that?

Miss Irwin: "Yes.

The court: "The court will issue an attachment for Miss Irwin to insure her presence.

Mr. Stewart: "Under which, your honor, she is entitled to sign her own recognizance, under the law.

The court: "Do you represent her?

Mr. Stewart: "Why, certainly; I will represent anyone that is being coerced—

The court: "I asked you do you represent her?

Mr. Stewart: "Yes; I will represent her for that purpose. She is entitled to sign her own recognizance under the law.

Mr. Ditchburne: "An attachment for contempt. Is that what your honor has issued—an attachment for contempt?

The court: "Yes; we will take up the matter when it is formally presented. First we will issue the attachment.

Mr. Stewart: "She is here. What is the attachment for?

The court: "Do you represent her?

Mr. Stewart: "Yes, I do.

The court: "Well, then, file your appearance.

Mr. Stewart: "I will file an appearance. Enter my appearance for Lorraine Irwin. She is a citizen and entitled to have protection.

Mr. Ditchburne: "Well, she has another lawyer in another court.

Mr. Stewart: "All right. I will represent her here in these high-handed methods. I will enter an appearance; yes.

The court: "The high-handed methods in this matter—

Mr. Stewart: "I will withdraw that.

The court: "—happened before these parties came into the jurisdiction of this court. You will remember that.

Mr. Stewart: "Of course. I say respectfully to the court, the court knows the law with reference to a witness. All the witness can do is respond as a witness.

The court: "The court is not holding her as a witness. What is your address, Miss Irwin?

Miss Irwin: "4134 Sheridan road.

The court: "Do you actually live there?

Miss Irwin: "No.

The court: "It is not your address, is it?

Miss Irwin: "I receive mail there.

The court: "Where do you live? (No response.) Do you refuse to answer?

Mr. Stewart: "I will advise her that she does not have to answer, your honor.

The court: "Do you refuse to answer on the advice of counsel?

Miss Irwin: "Yes.

The court: "You do?

Miss Irwin: "Yes.

The court: "Attachment for contempt; custody of the sheriff. And see, Mr. State's Attorney, that in answer to any writ of *habeas corpus* the attachment is made a part of the writ of the sheriff."

The fourth alleged direct contempt, committed on February 23, expressed in the language of the court, is that plaintiff in error "then and there charged the court with trying to induce the witness Lorraine Irwin to say something different from what she had already said—that is to say, to commit perjury." The facts and circumstances recited in the record by the court in this case and the transactions recited in the record by the court leading up to this alleged contempt are, in part, as follows: After the adjournment of the Rongetti trial on the afternoon of February 21 plaintiff in error went to the court room of Judge

Gemmill to attend the hearing on the writ of *habeas corpus* and was called and testified there as a witness. The hearing on the writ of *habeas corpus* was continued, and after the adjournment of court plaintiff in error had a conversation with witness Irwin at the request of the bailiff or deputy sheriff, Edward Walther, who said to plaintiff in error: "Say, talk to this girl, will you? She is inclined to act up, and I don't want any trouble with her." Plaintiff in error then talked to Miss Irwin in the jury room of Judge Gemmill's court in the presence of three or four newspaper men. On the following day, February 22, it being a holiday and the courts not being in session, plaintiff in error, with the consent of the assistant State's attorney in charge of the Rongetti case, (Ditchburne,) interviewed Miss Irwin in the hotel room where she was being kept in custody of the police matron. On the following day, February 23, Miss Irwin was called as a witness in the Rongetti case. After she had given some testimony in the Rongetti case the jury was excused. The assistant State's attorney then told the judge that Miss Irwin had informed him that plaintiff in error had threatened to attack her reputation if she testified. The court then examined Miss. Irwin concerning these alleged facts and then stated to her: "Now, Miss Irwin, I want to advise you that this court will not permit any attack on your reputation. You need not have any fear of that; you tell just the truth and tell it candidly. That, you owe to the court, you owe it to your conscience and you owe it to your God." Thereupon plaintiff in error said: "I take exception, your honor, to the court's making such a statement to the witness in an effort to get her to say something different than she has already said."

The fifth and last alleged direct contempt of court occurred on the 23d day of March, and in the language of the court is that plaintiff in error "in open court, under oath, charged this court with attempting to decoy the witness Lorraine Irwin into a position that would justify the

116

court in attaching her for contempt." This fifth charge of the court is based upon an answer made by plaintiff in error to a question asked him by the court when plaintiff in error was a witness for himself during the investigation that culminated in the order finding him guilty of contempt of court. The question asked and the answer given related to the incident during the Rongetti trial when an attachment was issued for Miss Irwin, apparently to insure her presence as a witness at the trial, and the question and answer are the following:

The court: "Then you thought the court was attempting to decoy her into a position that would justify the court in attaching her for contempt?

Mr. Stewart: "It amounted to that, in my opinion; yes."

In cases of direct contempt—that is, contempt committed in open court—the only record required to be made up is the order of the court finding the contempt to have been committed and fixing the punishment therefor, which order should set out the facts constituting the offense so fully and certainly as to show that the court was authorized to make the order. (*People* v. *Hogan,* 256 Ill. 496.) In a case where the proceeding for contempt is for acts committed out of the presence of the court and not in furtherance of a remedy sought in a suit or in enforcement of the orders or decrees of the court but to maintain the authority of the court and uphold the administration of justice, if the person accused should answer under oath denying the alleged wrongful acts his answer is conclusive and he is entitled to his discharge. (*People* v. *McDonald,* 314 Ill. 548; *People* v. *Seymour,* 272 id. 295.) If the answer proves false the remedy is by indictment for perjury. (*Hake* v. *People,* 230 Ill. 174.) Since in this case plaintiff in error is adjudged guilty of direct contempt and the order makes findings of fact concerning things done and said outside the presence of the court, it is pertinent to inquire whether the court, in adjudging plaintiff in error in contempt and order-

ing punishment therefor by imprisonment in jail, took into consideration matters that were found to have occurred out of the court's presence, although plaintiff in error denied under oath any connection with such matters.

The trial judge in this case found that plaintiff in error and Louis Paynter corruptly conspired to get the witness Lorraine Irwin out of the jurisdiction of the court well knowing that she was an important witness for the State, and that Paynter was guilty of a direct contempt of court and sentenced him to confinement in the county jail for sixty days, and that plaintiff in error immediately entered his appearance as attorney for Paynter. The court also found that in the *habeas corpus* proceedings before Judge Gemmill plaintiff in error testified both as a witness and acted as counsel for the relator; that he conferred with Miss Irwin in the witness room of Judge Gemmill's court; that the proceedings before Judge Gemmill were a fraud upon the court and Judge Gemmill was imposed upon, and that plaintiff in error, the attorney who sought the writ of *habeas corpus,* and Lucille Altier, alias Marie Russell, entered into a corrupt conspiracy to obstruct the administration of justice by getting the witness Lorraine Irwin out of the jurisdiction of the court so that she might not be available as a witness for the prosecution in the Rongetti case. All the foregoing findings of the court recited in this paragraph are set forth in the certificate of the evidence and findings of the court in this case.

There is no evidence whatever in this record that supports or tends to support the finding of the court that Louis Paynter was guilty of a direct contempt. The finding is apparently based upon the examination of Paynter by the court in which numerous questions by the court were asked him, and Paynter's answers to those questions are set out in the abstract of the record. In that examination the court told Paynter repeatedly that he did not believe his answers were true. The court concluded the examination by a direc-

tion to the assistant State's attorney, Ditchburne, to prepare a proper petition for the grand jury, and then said that he believed that Paynter had lied to him, and "I will commit him for contempt now." In reversing the order of the court adjudging Paynter guilty of direct contempt the Appellate Court said: "We have scanned the record, and all the evidence in it, in an effort to find a justification for the court's action but fail to find any evidence justifying Paynter's commitment. There is not one scintilla of evidence, either from the testimony of Lorraine Irwin or Paynter or the police officer, or anyone else testifying, to prove that Paynter was guilty of a contempt of court committed in the presence of the court. Lorraine Irwin denied that Paynter endeavored in any way to influence her in the case. * * * The proceeding is irregular and illegal in every particular. There is no justification in the record for the court's action." *People* v. *Paynter,* 250 Ill. App. 423.

As shown by the record made up by the court in this case, plaintiff in error testified under oath that the first time he ever saw Lorraine Irwin was in the court room when the Rongetti case was called for trial on February 20, 1928; that before that time he had not been in communication with her and had had no one else see her for him; that he had nothing whatever to do with filing the petition for *habeas corpus* in her behalf; that he had nothing to do with her reluctance to testify; that he never suggested to her that she should tell the State's attorney that she would rather commit perjury than testify; that he never threatened or intimidated her at any time or place, and that he in no way participated in any threat against her life or any attack upon her character.

At the beginning of the hearing which culminated in the order adjudging plaintiff in error guilty of contempt the court said: "The only thought I am interested in is the substantial one—fundamental, that is—with contempt growing for law, the organized crime practically in open

rebellion against authority, with the highways policed by men carrying guns who have no authority in law to carry them, with armored tanks running through town at night, and sawed-off shot-guns executing people who adhere to the obedience of law and live decent lives, then if they reach actually into a court room where a person is under process to serve and if they can intimidate a person—that is all we are interested in." And at the conclusion of the hearing and before the entry of the order the court said: "Those who would violate justice in her own house, those who scoff at the administration of the law, those who would dare reach into the very court and there directly and designedly seek to drive a witness from the jurisdiction of the court, they are guilty of a contempt that if tolerated or condoned would make the law a meaningless mockery, and any court that would countenance such conduct would soon merit, and receive, the contempt of any civilized people."

It is clearly apparent from the showing in this record that the court, in fixing the penalty of three months in the county jail for direct contempts by plaintiff in error, considered matters that the court found occurred out of the presence of the court, although plaintiff in error had denied under oath participation in any of such outside matters with which he was charged. It is also just as apparent that the attitude of the trial court toward plaintiff in error all through the Rongetti trial and the proceedings for contempt against him was one of hostility. For the reasons aforesaid plaintiff in error was given considerable provocation by the court by his actions and rulings and stinging remarks while making his investigations of the charges of the assistant State's attorney to the effect that some parties in behalf of plaintiff in error's client were trying to intimidate the witness Lorraine Irwin and prevent her from testifying against his client, Dr. Rongetti, and that she had determined to commit perjury rather than give evidence that would send Rongetti to the electric chair to be executed. The rulings and

120

actions of the court were very prejudicial to plaintiff in error's client, who was being tried for murder, and the unnecessary speeches or utterances of the court that have been recited also tended to put plaintiff in error under suspicion by the spectators at the trial that he was one of the conspirators who attempted to prevent the witness Irwin from testifying against his client. Plaintiff in error was not attorney for Rongetti at the time the threatening letter was received by Miss Irwin, or at the time, according to her statement, that two strangers called on her and threatened her with violence if she testified against Rongetti. Nevertheless these occurrences were both emphasized in the order of the court in this case. He was not employed as attorney for Rongetti until about February 2, 1928, when he entered his appearance in that case. It is not true that he acted as Miss Irwin's attorney in the *habeas corpus* proceedings before Judge Gemmill. Her attorney in that case and plaintiff in error both so testified. The charge by the court that plaintiff in error and the attorney for Miss Irwin in the *habeas corpus* proceedings entered into a corrupt conspiracy to obstruct the administration of justice by getting the witness Irwin out of the jurisdiction of the court so that she might not be available as a witness for the prosecution in the Rongetti case is not supported by the evidence in the record. The charge suggested by the assistant State's attorney that there had been an attempt to prevent her from testifying and that she would not testify is not even supported by Miss Irwin's testimony. She was called as a witness and on these points testified as follows:

The court: "Has there been any effort made to interfere with your telling the truth here? I want to know the truth, now.

Miss Irwin: "No; there has not.

The court: "Has anybody attempted to urge you not to testify and to get out of the jurisdiction of this court?

Miss Irwin: "No one.

The court: "Were you thinking of leaving the jurisdiction of the court?

Miss Irwin: "No."

Aside from the foregoing considerations, so far as the acts alleged to have occurred outside of the court's presence are concerned, their denial under oath by plaintiff in error legally excludes them from the court's consideration in determining whether he was guilty of direct contempt.

The first alleged direct contempt, committed on February 21, that "plaintiff in error entered his appearance as attorney for Lorraine Irwin, one of the witnesses for the State in the Rongetti case, without appointment by the court and without authority from the said witness," was not shown to be a contempt of court. Plaintiff in error merely volunteered to enter his appearance to represent her as her attorney, and his language heretofore quoted on that point does not show otherwise. In other words, he did not represent to the court that she had asked him to represent her as her attorney. Miss Irwin by her action consented to accept him as her attorney, and the court sanctioned his action and her action by telling plaintiff in error to enter his appearance for her, which he proceeded to do. As her attorney he had a right to advise her in her examination before the court.

The fifth and last alleged direct contempt of court, which occurred on the 23d day of March, is not in reality a contempt of the court. It occurred in this wise: Plaintiff in error had just testified in his own behalf in this case, and after he had given his testimony the court asked him the direct question, "You thought the court was attempting to decoy her [Miss Irwin] into a position that would justify the court in attaching her for contempt?" Plaintiff in error gave his answer to that question, as was his duty to do, and very frankly made this answer to the court, "It amounted to that, in my opinion; yes." The court had no right, legally speaking, to punish the witness for frankly

answering a question that the court had asked him to answer. He would have been more nearly in contempt if he had refused to answer at all.

On this review by writ of error there are two matters or questions for consideration by this court: (1) Whether the court, in finding plaintiff in error in contempt, took into consideration matters which it found occurred out of the court's presence although plaintiff in error denied, under oath, any participation in or connection with them; (2) was the penalty assessed by the court unreasonably severe or excessive?

We are of the opinion that the penalty fixed by the court was unreasonable and excessive. In reaching that conclusion we desire to say that we base it upon two considerations. The first is the fact that the court in fixing that penalty considered matters that occurred out of court and with which plaintiff in error was not really connected—that is, was not guilty of the alleged indirect contempts charged against him; and the second is that the court failed to accord to him that due respect and consideration to which he was entitled as an attorney and officer of the court. Oswald, in his work on Contempt, (1911, pp. 17, 18,) says: "It should always be borne in mind in considering and dealing with contempt of court that it is an offense purely *sui generis* and that its punishment involves in most cases an exceptional interference with the liberty of the subject, and that, too, by a method or process which would in no other case be permissible or even tolerated. It is highly necessary, therefore, in all questions of this nature, where the functions of the court have to be exercised in a summary manner, that the judge in dealing with the alleged offense should not proceed otherwise than with great caution and deliberation."

For the reasons aforesaid the judgments of the Appellate Court and of the criminal court of Cook county are reversed.

*Judgments reversed.*