The People of the State of Illinois, Appellee, v. Max Bialek, Appellant.

Gen. No. 48,230.

First District, Third Division.

April 26, 1961.

Fisher & Lintz, of Chicago, for appellant.

Daniel P. Ward, State's Attorney of Cook county, (Francis X. Riley and James R. Thompson, Assistant State's Attorneys, of counsel) for appellee.

MR. JUSTICE McCORMICK delivered the opinion of the court.

This appeal is taken from an order entered in the Superior Court of Cook County finding Max Bialek, hereafter referred to as the defendant, guilty of a direct contempt of the Superior Court of Cook County and sentencing him to the County Jail of Cook County for a period of thirty days. The defendant's theory here is that he did not intentionally give false answers affecting material issues and that he was confused by the cross-examination inasmuch as the attorney who cross-examined him included in his questions inferences and inaccuracies.

There has been an increase in the cases brought to this court to review contempt orders entered by the trial court based on false testimony given by witnesses in the trial of a case. Within a comparatively recent period we have had before us People v. Hewlin, 28

Ill. App.2d 40, 169 N.E.2d 819, and People v. Koniecki, 28 Ill. App.2d 483, 171 N.E.2d 666.

"Contempt" is defined as any act or conduct which is calculated to embarrass, hinder or obstruct the court in the administration of justice or to lessen its authority or dignity. 12 I.L.P. Contempt, sec. 21. "Perjury or false swearing by a witness may, under some circumstances, be treated as a contempt, notwithstanding it is also punishable as a criminal offense. However, such procedure is warranted only when exceptional conditions justify it." 12 I.L.P. Contempt, sec. 27. In the case before us the commitment was for a direct criminal contempt.

 The only record properly before this court in cases of this character is the order entered by the trial court. In People ex rel. Butwill v. Butwill, 312 Ill. App. 218, 38 N.E.2d 377, the court says: "An order committing a witness to jail for direct contempt in giving false testimony must set forth the facts so fully and certainly as to show the crime was actually committed. The language of the order must be strictly interpreted and no presumptions can be indulged in its favor. People v. Salbar, 282 Ill. App. 506. Such a case will be considered in this court on the order alone. People v. LaScola, 282 Ill. App. 328, 329." See also People v. Hogan, 256 Ill. 496, 100 N.E. 177.

██ ██ A direct criminal contempt is one which takes place in the very presence of the judge, making all of the elements of the offense matters within his own personal knowledge. People v. Harrison, 403 Ill. 320, 86 N.E.2d 208; People v. Berof, 367 Ill. 454, 11 N.E.2d 936. At the trial it must be made to appear by the witness' own admission, or perhaps by unquestioned or incontrovertible evidence, that the testimony he gave was false. People v. Vogel, 335 Ill. App. 475, 82 N.E.2d 378. In People v. Hagopian, 408 Ill. 618, 621, 97 N.E.2d 782, the court says: "A direct

criminal contempt consists of any conduct which tends to embarrass or obstruct the court in the administration of justice or tends to bring the administration of the law into disrepute. (People v. Sherwin, 334 Ill. 609; People v. Cochrane, 307 Ill. 126.)" In People v. Hille, 192 Ill. App. 139, the court says:

". . . it must appear beyond a reasonable doubt from the personal knowledge of the court, or by admissions from the lips of the defendant himself in open court, and in the presence of the court, and from no other source whatsoever, that (1) the representations so made were false and untrue when made; (2) that the defendant knew of their falsity when he made them; and (3) that he made them knowing their falsity and with a wilful and malevolent intention of assailing the dignity of the court, or of interfering with its procedure and the due administration of justice. . . .

"Before a person can be found guilty of contempt of court it must clearly appear that in committing the offense complained of he was actuated by some malevolent intention to assail the dignity of the court, or to wilfully and knowingly interfere with its procedure or due administration of justice. There must be a union or joint operation of act and criminal intention."

In People v. LaScola, 282 Ill. App. 328, the court, after citing the perjury statute, says:

"And it is also the law that because perjury, which tends to obstruct the administration of justice, is punishable as a criminal offense is no reason why it may not also afford basis for punishment as a contempt; but that punishment for a contempt is only warranted when exceptional conditions so justify. Ex parte Hudgings, 249 U. S. 378; People v. Anderson, 272 Ill. App. 93.

284

"In the Hudgings case the court said (p. 382): 'Because perjury is a crime defined by law and one committing it may be tried and punished does not necessarily establish that when committed in the presence of the court it may not, when exceptional conditions so justify, be the subject-matter of a punishment for contempt.'

"In the Anderson case, 272 Ill. App. 93, the court quoted with approval the statement of this rule from 11 A. L. R., p. 343 (p. 100): 'The rule is well settled that perjury or false swearing may, *at least under some circumstances,* be punished as a contempt of court.' But there is some doubt whether this rule is the law of this State. People v. Hogan, 256 Ill. 496. In that case one was committed to jail for an alleged contempt committed in open court without plea, issue or trial; the court, after holding that the commitment was unwarranted, said (p. 501): 'It is not to be inferred because the question is not discussed, that we think a court can in any case, upon its own knowledge of the facts, punish summarily as for a contempt against the dignity of the court, a witness who has testified falsely in a cause.' "

See also People v. Koniecki, supra, and People v. Hewlin, supra.

In the case before us the order of the court recites that the court has jurisdiction and finds that the defendant had filed a suit against the Yellow Cab Company. In the complaint he alleged that on March 19, 1956 he and one Jean Bialek were passengers in a cab and were exercising due care, that the driver negligently collided with the rear of another vehicle, and that the plaintiffs sustained injuries, had medical expenses, were prevented from attending to their usual employment and lost a large amount of income thereby, to their damage in the sum of $50,000 each.

285

The order sets out in detail certain testimony given by the defendant on direct examination and in greater detail the testimony given by him on cross-examination. Fifteen pages of the record are devoted to a recital of the testimony.

The witness on direct examination testified that after the date of the accident (March 19, 1956) he first returned to work in June, that he did low work, and that he remained on the job until July 20th. On cross-examination he testified that from March 19th until June he did not return to work at all. The cross-examiner in the course of his cross-examination went over the biweekly periods commencing at March 15th. The witness stated that he did not remember whether or not he worked, nor whether he was off work from the time of the accident until June of 1956. The cross-examiner questioned him as to whether he had worked in the period from April 30th to May 15, 1956 and in that period put in 16 hours of overtime. The defendant stated, "We never worked overtime," and the court then interposed, asking him if it was true or not. The witness then stated: "If I worked, I must have worked then." The question was then asked: "Well, then, it's true, isn't it?" The witness answered "Yes."

The People in their brief state that defendant admitted that his testimony that he did not work from March 19th until June of 1956 was not true and that "this self-confessed perjury, as to a material matter, was a direct contempt." Apparently this statement is the principal one upon which the State relies. However, in the record on cross-examination the following questions and answers appear:

"Q. And isn't it true that you were off of work from the time of this accident until June of 1956? Is it?

286

"A. I can't remember that.

"Q. Well, you just testified to it.

"A. But I can't remember if I worked or not."

Later the witness was asked the following question, which is not based on any testimony of the defendant appearing in the record, and the following answer was given:

"Q. But you do remember that you didn't work until June 20, or do you want to change that now?

"A. Well, if I worked, then I'll have to change it."

Then he was asked as to whether during the two periods from May 31st to June 15th and from June 15th to June 30th he did not put in overtime, and he said he did. Then the following took place:

"Q. Will you tell this jury now whether or not it isn't a fact that this period of time which you previously told us you didn't work, that you actually put in two weeks, during that two-week period from June 15th? That would be the sixteenth, the day following, to June 30th, whether or not you put in twenty hours of overtime, for which you received a check for Two hundred Seventy-five dollars. Is that true, sir?

"A. That's true."

The only contradiction appearing in this portion of the examination is that referring to the period from the date of the accident until the first of June. Nowhere in the record has the witness testified that he did not return to work until June 20th. All of these questions are not based on testimony appearing in the record and are confusing and unfair.

The cross-examiner also went into the question of earnings of the defendant. The questions and answers

287

are as follows (the asterisks appearing below being contained in the trial court's order, indicating omissions of testimony):

"Q. In 1956, what were your earnings at Loyola University?

"* * *

"A. For the whole year?

"Q. You tell me what your recollection was. You testified that in 1957 you earned thirty-one hundred; in 1958 thirty-four hundred; and in 1959, forty-two hundred. Right?

"A. Yes.

"Q. How much did you earn in 1956?

"A. It was over four thousand.

"Q. A little over four thousand dollars?

"A. Yes, over four thousand dollars.

"Q. So that because of this illness, or whatever you[r] condition is that you have described here, you earned less money in 1957 than you did in 1956 and in 1956 you spent considerable time away from your employment while you were hospitalized, both at Mount Sinai Hospital—

"A. That's right.

"Q. —and while you were hospitalized at Billings Hospital for this operation. It that correct?

"A. That's correct.

"* * *

"Q. And in each instance, Mr. Bialek, you had to file income tax returns, didn't you?

"A. Yes, sir.

"Q. And these income tax returns correctly set up your income, don't they?

"A. That's right.

"* * *

"Q. All right. Now, I ask you to look at what has been identified as Defendant's Exhibit 2, for

288

identification, and ask you whether or not that contains your signature?

"A. Yes, sir.

"Q. And does it also contain your wife's signature?

"A. Yes, sir.

"Q. In other words, that reflects your income for the year 1957, does it not?

"A. That's right.

"Q. It is what we call a joint return by both you and your wife.

"A. That's right.

"Q. Now, will you look at that return, please, and tell me how much money you earned for the year 1957?

"* * *

"Q. Sir, if you said thirty-one hundred dollars, and the records of the United States Government that you swore to, showed fifty-nine hundred and ninety-eight dollars, then that thirty-one [hundred] dollars statement is not true, is it?

"A. No."

It is apparent that there was no false testimony here. There is no admission on the part of the defendant that he had earned $5,998 in the year 1957. Nor is there any admission on his part that the income tax return showed that he earned $5,998. Nor is there anything in the record from which the court might find that such statement was contained in the return. The question is palpably unfair.

In his direct examination he testified that after his return to work he did "low work" using no equipment. With reference to that statement we find in the record the following cross-examination:

"Q. And during all of this time, isn't it a further fact, Mr. Bialek, that you did the same work

289

that you had been doing at this place from the time that you started to work there on February —

"A. February first.

"Q. —February 1, 1956, isn't that true?

"A. That's true.

"Q. That included low work and high work, isn't that true, sir?

"A. That's true.

"Q. So do you want, at this time, to change your testimony that all you could do following this accident was low work?

"A. Yes.

"Q. And you were lying to this jury when you told them that all you could do was low work since this accident?

"A. I didn't lie to the jury. I did low work.

"Q. That you said only low work?

"A. Low work.

"Q. You were lying about it, is that right.

"A. That is what I did.

"Q. Is that right?

"A. That's right."

It is apparent that the witness was sticking to his testimony that he only did low work, but by this time he apparently was so conditioned that he was not very certain of the matters about which he was testifying.

In his direct examination the witness testified that after he left work on July 20th he went to Mayo Clinic, stayed there a week, was given a general checkup and treated, and returned to Chicago and did not go back to work. He then went to Billings Hospital under the care of Dr. Pearlman, who operated on his ear. He was in Billings about two weeks. He thinks he was in Billings in August. After getting out of the hospital he stayed home from four to five weeks and was in bed most of the time and had attacks of dizzi-

290

ness, that later in the year he returned to work at Loyola and was still on low work and stayed at Loyola until April, 1957.

On cross-examination he testified that he returned to work in September, and that he was off for the balance of July and all of August. He then was questioned further concerning the time when he returned to work. He was asked the following:

"Q. You worked steadily in the month of August, is that correct?
"A. In 1956?
"Q. Yes, sir.
"A. In August, I went to Billings.
"Q. All right. But in spite of that fact, from August 15, 1956, to August 31, 1956—in spite of the fact that you went to Billings, you put in sixteen hours for that two-week period, is that correct?
"A. Yes.
"Q. Put in two full days of work; then for the period running from August 31, 1956 to September 15, 1956, you put in eighty-four hours. In other words, you put in four hours of overtime?
"A. Yes."

Then he was asked:

"Q. And, then, it is a further fact, is it not, sir, that you did not quit on July 20, 1956; and that when you told this jury that you quit work on July 20 of 1956, you were not telling the truth?
"A. I didn't quit July 20th."

(Previously he had stated that he had taken a paid vacation on July 20th.)

Analyzing the testimony it appears that on direct examination he had testified that he had gone to Mayo's after July 20th for a week, that he then went to Billings—he thinks in August—and was there for

291

two weeks, and that he stayed home four to five weeks and did nothing. By a process of addition that would indicate that he was off work for seven or eight weeks. Seven weeks would bring him up to September 4th, eight weeks to September 11th. On cross-examination he stated that he went to work in September. On cross-examination he further stated that in the two-week period from August 15th to August 31st he put in two days of work. Then on further cross-examination he testified that from August 31st to September 15th he put in 84 hours of work. The only testimony which deviates in any way from his testimony on direct examination is concerning the two days' work that he did in August and the five days' work he did in September. That also, apparently, is considered one of the bases for the contempt order. Then the cross-examiner asks the following:

"Q. And from there to October 15, 1956, that two-week period from September 30th, to October 15, 1956, you put in sixteen hours of overtime, or ninety-six hours, isn't that true?

"A. That's true."

Then in the same type of question inquiry is made about the periods from October 15th to October 31st, October 31st to November 15th, November 15th to November 30th, November 30th to December 15th, December 15th to December 31st, January 1st to January 15th, January 15th to January 31st, February 1st to February 15th, and February 15th to February 28th, and the defendant testifies that he quit work in April. Then the following question is asked:

"Q. Up until the time that you resigned in April of 1957, there was not a two-week period that you did not put in overtime and get paid for

it, and you worked steadily every day that they were open for business, isn't that right?

"A. That's true."

In the testimony concerning his work from October 15th to the time he resigned we are unable to find any contradiction of previous testimony.

In the People's brief is the following statement:

"Under cross-examination, he affirmed that he was off work for the balance of July, all of August and did not return to work until September (Abst. 4).

"On further cross-examination, however, he finally admitted that from August 15 to August 31 he put in 16 hours of work and from August 31 to September 15 he put in 84 hours of work! (R. 18). All this during the time he had positively said that he had not worked, and could not, under his own testimony, have returned to work before September 15 (Abst. 3-4)."

In spite of the fact that the statement in the brief is stressed with an exclamation point, we find nothing to substantiate it on page 18 of the record. Nor, as we have pointed out, do we find that, taking the approximate dates given by the defendant on his direct examination, it would require us to believe that he did not go to work until September 15th. There was a discrepancy in the testimony concerning the two days' work in August and five days' work in September, and the People say that this evidence, standing alone, is sufficient to sustain the contempt conviction. With that we cannot agree. As we have indicated, much of the testimony contained or set out in the court's order shows no contradiction or inconsistency, and hence bears no relevancy to the issue before the court. In

Powers v. The People, 114 Ill. App. 323, the court, on page 328, says the following:

> "As early as 1842 Mr. Justice Breese in Stuart v. The People, 3 Scam. 395, uttered these memorable words: 'It (the power to punish for contempt of court) may be so frequently exercised as to destroy that moral influence which is their best possession, until finally the administration of justice is brought into disrepute. Respect to courts cannot be compelled; it is the voluntary tribute of the public to worth, virtue and intelligence; and while they are found upon the judgment seat, so long and no longer will they retain the public confidence. . . . It is at best an arbitrary power and should only be exercised on the preservative and not on the vindictive principle. It is not a jewel of the court to be admired and prized, but a rod rather, and most potent when rarely used.' "

Professor Walter Nelles, in an article, "The Summary Power to Punish for Contempt," 31 Columbia L. Rev. 956, discusses the history of contempt and points out that it is sui generis, and says:

> "The proper limits of the power with respect to perjury, long obscured in a cloud of loose decisions, have latterly tended to become clear. It would be intolerable that witnesses should testify in fear of summary punishment if they should seem to testify falsely. That would indeed make the contempt power a 'legal thumbscrew'; an honest witness would be in danger of committal until he should testify in a way which the court deemed truthful. But the power can undertake a little more than to compel witnesses to answer questions somehow. In an illuminating case, a witness who 'blocked inquiry' by persistent and manifestly perjured evasion of disclosure as to a

matter surely within his knowledge was committed for ten days. 'At the end of that time,' said Judge Learned Hand, 'he may appear before the commissioner and see whether he can tell a story which is not so obviously a mere sham.' [Citing United States v. Appel, 211 Fed. 495.] The court did not, however, conceive that it could undertake either to extort the truth, or to *punish* for falsehood."

In People v. Rongetti, 344 Ill. 107, 122, 176 N.E. 292, 297, the court quotes with approval from Oswald on Contempt (1911, pp. 17, 18):

" 'It should always be borne in mind in considering and dealing with contempt of court that it is an offense purely sui generis and that its punishment involves in most cases an exceptional interference with the liberty of the subject, and that, too, by a method or process which would in no other case be permissible or even tolerated. It is highly necessary, therefore, in all questions of this nature, where the functions of the court have to be exercised in a summary manner, that the judge in dealing with the alleged offense should not proceed otherwise than with great caution and deliberation.' "

Frequent criticism has been leveled at our judicial procedure based upon the harsh and inhuman treatment of witnesses. Charles Dickens bitterly satirized the cross-examinations conducted by Serjeant Buzfuz in *Pickwick Papers*. Witnesses have frequently expressed the feeling that when they appeared as a witness in court they were treated as malefactors rather than as citizens doing their duty in the temple of justice. It is understandable that in the heat of a forensic duel tempers become frayed and the niceties of conduct are not rigidly observed. A certain amount of

harassment of a witness on the witness stand probably is inevitable, but if in addition to this harassment we permit the sword of Damocles to be poised over their heads in the threat that for any false statement made on the witness stand they may be summarily punished for contempt, we are hindering and not advancing the cause of justice. The purpose of a trial of a case under our system is to attempt to find the truth. The way to that end is not by badgering a witness or by confusing him by misstatements of the testimony given by him.

■ We do not wish this opinion to be construed as holding that a trial court may not properly hold a witness in contempt when he admits that the testimony which he has given before the court is false. In order to have a valid contempt order, however, it is necessary that there be elements in the case other than the mere fact that the witness on cross-examination gives testimony which directly differs from that given on direct. The admission of the witness that the testimony was false must also be accompanied by an admission that it was wilfully false or the circumstances must be such that the court can as a matter of law so hold.

People v. Freeman, 256 Ill. App. 233, cited by the People, was a case where a witness was found guilty of contempt because in a suit concerning illegal voting he had on direct examination testified that he had voted at different times and at different places on the same day and at the same election, and that at the time he was driven to the places in an automobile accompanied by three or four other persons. On cross-examination he testified that he had not voted as testified by him on direct, that in a number of the answers given on direct he had lied, and that his answers to the questions on direct examination were false. The court says:

"If testimony as given by a witness is of a character that would show an utter disregard of the witness for the sanctity of his oath and consume the time of the court in answering a long line of questions on direct, which he subsequently on cross-examination declared to be false, we are of the opinion that such conduct would constitute a contempt of court. Answers of a witness to questions put to him, frivolous in their character, insulting to the court, or false in their entirety, would have a tendency to obstruct, hinder and delay justice and seriously interfere with the order and decorum of a trial."

The court sustained the contempt order. In People v. Hadesman, 223 Ill. App. 219, also cited by the People, on an examination made in the course of obtaining a jury in a murder case in the Criminal Court, the defendant was examined as to his qualifications to serve as a juror, and in response to questions he had stated that he was never interested in the outcome of any criminal case, that he was not in court when any criminal case was tried, and that he never was a witness in any criminal case. He later admitted that he had been indicted once for subornation of perjury, and that he was in the Criminal Court when the indictment was disposed of and that he was interested in the outcome of that case, and he further stated in open court that he had been interested in a charge of highway robbery made against his brother. The court upheld his conviction for contempt based on the admittedly false answers. The court in its opinion says:

"It is obvious from what appears in the judgment of the trial judge that the particular answers of the defendant were false when made; that at that time he knew they were false and

made them with the criminal intention of becoming a member of the jury when he was ineligible, thus interfering with the proper procedure of the court and the due administration of justice."

In both of these cases the facts are much different from the facts in the case before us and the court properly could hold that there was an obstruction of justice caused by the false answers of the witness.

 Paraphrasing the statement in People v. Koniecki, supra, we do not believe that the record establishes that Bialek was deliberately trifling with the court or that he was wilfully or intentionally contemptuous in his conduct and inconsistent statements, or that his conduct was calculated to embarrass, hinder or obstruct the court in the administration of justice or calculated to lessen its authority or dignity. We believe that justice will be best served by a reversal of this judgment.

The judgment of the Superior Court of Cook County is reversed.

Reversed.

SCHWARTZ, P. J. and DEMPSEY, J., concur.