STEVEN ZOKOYCH, Plaintiff-Appellee, *v.* BRUCE SPALDING *et al.,* Defendants-Appellants.

First District (3rd Division)   Nos. 57184-57383 cons.

Opinion filed February 19, 1976.—Rehearing denied April 1, 1976.

656

Jerome Rotenberg and Maurice L. Cowen, both of Chicago, for appellate Bruce Spalding.

Torshen, Cohen & Eiger, Ltd., of Chicago, and Donovan, Dichtl, Atten, Mountcastle & Roberts, of Wheaton, for appellant West Suburban Bank of Lombard.

Defrees & Fiske, of Chicago (Edward J. Griffin, of counsel), for appellee.

Mr. PRESIDING JUSTICE MEJDA delivered the opinion of the court:

Plaintiff, Steven Zokoych (Zokoych), commenced action for equitable relief and damages against defendants Bruce Spalding (Spalding), Spalding Manufacturing Company (Spalding Manufacturing), West Suburban Bank of Lombard (Bank), Ample Tool & Mfg., Inc. (Ample), Gay Burke and Robert G. Jaros. An amended complaint was filed and Ample was dismissed as a defendant. Burke and Jaros were dismissed at the close of plaintiff's evidence. After trial without a jury, the court entered a decree which awarded judgment against defendants Spalding, Bank, and Spalding Manufacturing for $40,013.66 compensatory and $30,000 punitive damages, for the total sum of $70,013.66, and costs of suit, and further released and discharged plaintiff from any obligation under his guarantee of Ample's corporate note to defendant Bank, and enjoined defendants from collecting or enforcing the guarantee as to plaintiff. Defendants appealed. Plaintiff cross-appealed from the refusal of the trial court to award him damages for loss of his half ownership in Ample. Defendant Bruce Spalding filed a further appeal which was consolidated here for hearing from an order finding him in contempt of court and imposing a fine of $1,000.

Count I of plaintiff's amended complaint alleged in substance, as to Spalding, Burke, Jaros, and Spalding Manufacturing: in breach of an agreement between them, Spalding did not return plaintiff's pledged stock in Ample and wrongfully purported to act as sole stockholder and owner of Ample and removed plaintiff and his wife as directors of the corporation; Burke and Jaros were purportedly elected as directors; Spalding, Burke and Jaros discharged plaintiff as president and purported to appoint Spalding; these defendants stopped payment of plaintiff's salary as president and wrongfully caused the removal of Ample's machinery and equipment to premises in Addison, Illinois, occupied by Spalding Manufacturing; Spalding and Spalding Manufacturing thereafter used the equipment for their own benefit, have collected and converted to their own use the accounts receivable of Ample and also

converted the business and good will of Ample to their own profit. Count I concludes that by reason of said acts Ample was deprived of its operating assets, its activities were completely stopped and its business and good will were injured and destroyed; Ample was prevented from paying its obligations and, due to the action of certain creditors, has been adjudged bankrupt; that Ample is indebted to plaintiff in excess of $50,000, and plaintiff has personally guaranteed other obligations of Ample in excess of $100,000; plaintiff will recover only a small part, if any, of Ample's indebtedness to him; the value of his half ownership of Ample has been destroyed; plaintiff's personal reputation and good will have been damaged; and he has suffered physical and emotional injury. In Count I plaintiff sought the following relief: (1) that he be declared owner of one-half of the outstanding shares of Ample and that Spalding be required to transfer that stock to him; (2) an order setting aside as illegal and void the election of new directors on May 15, 1970, and also the hiring of Spalding as president of Ample; (3) a declaration that plaintiff and his wife are directors and that plaintiff is president; (4) an injunction against defendants enjoining their use of Ample's assets and collection of its accounts receivable; (5) an accounting of the amounts owed to plaintiff by Ample and unpaid salary; (6) judgment for the value of plaintiff's one-half ownership of Ample; (7) a release of plaintiff's guarantees of Ample's debts; and (8) $500,000 compensatory and $500,000 punitive damages.

Count II of the amended complaint alleged that all of the named defendants, including the Bank, "wrongfully and unlawfully conspired and agreed upon a plan to defraud plaintiff by forcing plaintiff out as an officer and director of Ample, by appropriating and converting to Spalding's use plaintiff's entire stock ownership in Ample, and by appropriating and converting the assets, good will and customers of Ample to the use and profit of Spalding and Spalding Manufacturing Company." It was further alleged that pursuant to the conspiracy, Spalding, with the cooperation and assistance of Burke, Jaros and the Bank, caused the removal of the machinery and equipment of Ample to the premises of Spalding Manufacturing; that Spalding removed plaintiff as director and discharged him, and appointed himself as president of Ample; that Spalding notified customers of Ample to send money owed Ample and future orders to Spalding Manufacturing; that in furtherance of the plan and conspiracy to force plaintiff out of the control of Ample and to assist Spalding to convert Ample's assets, the Bank accepted and honored checks issued by Ample, and consented to the use by Spalding and Spalding Manufacturing of Ample's machinery and equipment in violation of the security agreement. It alleged that as a result, *Ample* was

deprived of its operating assets, sustained injury to its good will and business, was prevented from paying its obligations and was finally involuntarily adjudged bankrupt. Plaintiff alleged that because of the wrongful acts of defendants he will recover only a portion, if any, of Ample's indebtedness to him; that his ownership has been totally lost and destroyed, that *his* business reputation and good will have been irreparably destroyed, and that *his* salary and other benefits were denied him; further, that the wrongful acts of defendants were deliberately calculated to convert the assets and good will of Ample and to injure and damage plaintiff. Substantially the same relief was sought as in the previous count.

The evidence and testimony taken at trial may be summarized as follows. Ample was founded in 1959 by Zokoych (plaintiff) and Spalding. Each owned half of the issued stock. In 1965, Spalding sold to Zokoych his 75 shares which were returned to Ample as treasury stock. Spalding formed Spalding Manufacturing which became a competitor of Ample. During fiscal 1968 and 1969, Ample encountered financial difficulties due to the general downturn of business and Ample's large capital expenditures for machinery and equipment. The number of employees had been increased from approximately 15 to 40 in anticipation of a large volume of business. To maintain its cash flow during this period, Colonial National Bank loaned Ample $60,000 which was secured by a pledge on the home of one James Cerone, a friend of plaintiff's. Ample in turn pledged its 75 shares of treasury stock to Cerone as security. In the spring of 1969 Ample still experienced problems with an insufficient cash flow to meet current operating expenses, and was unable to borrow additional funds from other local lending institutions.

In March of 1969 Zokoych suggested that Spalding return to Ample as a partner. This culminated in a meeting on July 3, 1969, at which Cerone, Zokoych and Spalding discussed Ample's indebtedness and the immediate need of $10,000 to meet its payroll. Later that day, Spalding gave Zokoych a check for $10,000 payable to Ample. Spalding and Zokoych then executed a handwritten memorandum agreement which provided in relevant part that "Bruce Spalding has purchased one-half (½) ownership of Ample Tool & Mfg. Co." and that "Spalding & Steven Zoko [*sic*] will conduct business jointly & all other matters pertaining to Ample Tool & Mfg. Co." On the same day Zokoych delivered to Spalding his certificate for 75 shares in Ample, endorsed in blank.

Spalding testified that he acquired Zokoych's stock as of July 3, 1969; that Zokoych asked him to purchase Cerone's stock so that Spalding would have 100 per cent of the corporation; and that he paid approximately $54,000 to Cerone on September 18, 1969, and received the

treasury stock. He testified that a stock certificate for 150 shares of Ample was issued to him signed by him and Zokoych on November 10, 1969. The certificate, which was admitted as an exhibit, had been torn in half and taped together. Spalding explained that Ample's auditor, Jack Schwartz, saw Zokoych sign the certificate and that Schwartz tore it when he removed it from the corporate minute book. Schwartz denied witnessing Zokoych's signature and denied tearing the certificate. Spalding stated that in August of 1969, when Zokoych told him he could not get the stock held by Cerone without payment, Zokoych agreed to Spalding's payment to Cerone and acquisition of 100 per cent of Ample. It was stipulated, however, that Spalding had advanced only $38,000 to Ample.

Zokoych testified that he and Spalding agreed that the latter would lend additional money to Ample and pay off the Colonial loan, for which Spalding would receive the stock held by Cerone; that Spalding agreed to advance additional sums to Ample and would return to the company to supervise production; and that Spalding demanded Zokoych's stock as security until he received the treasury stock. Zokoych further testified—and was corroborated by Schwartz—that the net amount advanced by Spalding of approximately $38,000 was entered on Ample's books as a loan, not an investment, and that a portion of the funds used to pay off the Colonial loan was received by Spalding from the sale of some of Ample's machinery. After Spalding had possession of the treasury stock he told Zokoych that he would continue to hold plaintiff's stock as security until Spalding's loans were repaid by Ample. Payments of $400 per week were made on the Colonial loan by Ample until Spalding and Ample paid off the remaining balance; thereafter, Ample paid $400 weekly to Spalding. At trial, Spalding denied that the payments were to repay his loans and claimed that Zokoych "wanted him to have the money." Ample's books reflected the payments as repayment of Spalding's loans. Schwartz, who was also Spalding Manufacturing's auditor, was hired by Ample soon after Spalding returned to Ample.

Although Spalding claimed at trial that he had been the owner of all of Ample's stock since September of 1969, several witnesses testified that he continued to hold out himself and Zokoych as equal owners or "partners." The president and the loan officer of the Bank assumed that they were partners, as did Gay Burke, Spalding's daughter, who worked as Ample's secretary from December 1969 through May 1970. Spalding, who had had previous associations with the Bank, advised its president that Zokoych had been the sole owner of Ample and that he and Zokoych were partners.

On October 30, 1969, Ample obtained a loan of $100,000 from the

Bank, evidenced by Ample's 5-year installment note for $127,500, secured by its machinery and equipment. Both Spalding and Zokoych signed Ample's note as personal guarantors. A more formal agreement between Spalding and Zokoych, prepared at Spalding's direction in January 1970 by his attorney, was never executed. It provided that Spalding was to receive 75 shares of treasury stock in return for loans to be made to Ample and that Spalding was to hold Zokoych's shares as security for repayment of the loans. A revision of the proposed agreement was prepared by Spalding's attorney in March 1970 which added a provision that if Spalding in his sole judgment determined Ample in financial straits, he may declare the agreement in default and take whatever steps necessary to protect his interest. The revision was not, executed.

On May 13, 1970, Spalding told Zokoych he was fired as president and director of Ample and handed him a copy of Ample's minutes reflecting the action. Zokoych protested both to Spalding and to the Bank. Zokoych advised the Bank, through his attorney on May 15, 1970, by telephone and by letter, that he was president and that the Bank was not authorized to cash any of Ample's checks which did not bear his signature. The record shows that the Bank had corporate resolutions of Ample and signature cards dated October 25, 1969, designating Zokoych as president and Spalding as secretary-treasurer, and corporate resolutions and signature cards dated May 15, 1970, designating Spalding as president and Burke as secretary-treasurer.

Spalding testified that in May 1970 he met with an officer of the Bank and discussed moving Ample's machinery and equipment to Spalding Manufacturing to avoid an execution thereon by Cerone who had a judgment against Ample. The Bank's president, Ralph Acker, testified that the Bank agreed to allow Spalding to move the equipment on the date that it was moved and that the Bank's letter dated May 29, 1970, authorizing Ample to move its machinery may have been prepared 2 weeks after the move. Acker further testified that the Bank had no intention of taking possession of the equipment at that time; that no inquiry was made of Spalding as to Zokoych's ownership interest in Ample; and that he had always assumed that Zokoych and Spalding were partners. He also stated that the Bank would not have insisted upon Zokoych's individual guarantee of Ample's loan if Zokoych had not been an owner.

Spalding testified that early in May of 1970 he advised the Bank that there would be an internal change in Ample and that Zokoych would be removed. About a week later he notified the Bank that Zokoych had been fired as a director and officer of Ample. Later in May Spalding

advised that Ample could not pay its loans. He stated that his attorney told him to move the equipment, but denied that he requested permission of the Bank. The cost of moving the equipment was approximately $15,000. Spalding testified that after the move he notified Ample's customers by letter that the business of Ample had been taken over by Spalding Manufacturing and that purchase orders issued to Ample should be canceled and reissued to Spalding Manufacturing. Customers' checks payable to Ample were turned over to the Bank where the proceeds were either applied to Ample's loan balances or given to Spalding.

Throughout 1969 and 1970, Ample never missed a payment on its loans to the Bank. The Bank's records reflected that Ample's payroll account had been overdrawn from time to time since January 1970 and overdrawn more than $1,000 at the close of business on May 28, 1970. However, Charles Lazier, the Bank's loan officer who dealt with Zokoych and Spalding, testified that neither of Ample's loans was in default on the day the equipment was moved and that the payroll account was closed about June 1, 1970, with a balance of $1,076.36. He further stated that when the Bank was served with a garnishment on the Cerone judgment, a balance of $2,199.03 in the payroll account was applied against the balance due on Ample's note to the Bank. Prior to June 1, 1970, Spalding had withdrawn large sums of money for his personal use. The evidence shows that the balance of the proceeds from the original $100,000 loan to Ample was deposited in Ample's general account. By early April 1970, when the Bank made an additional loan of $15,000 to Ample, guaranteed by Spalding, the general account was overdrawn by $8,000. The general account was closed by the Bank on May 6, 1970, and thereafter, only the payroll account remained open. Cerone obtained a judgment by confession against Ample for $13,750, and on May 22, 1970, filed a garnishment against the Bank. The Bank has never made any payment on the garnishment. No demand or notice of default as to the two Bank loans was made upon Zokoych, Spalding or Ample prior to a demand upon Spalding in July 1970. Subsequently, Ample was placed in bankruptcy.

The Bank president, Acker, testified that he agreed to the move of Ample's equipment on May 29, 1970, and that on that date, or as early as a week before, during a meeting with Spalding, Spalding's attorney and the Bank's attorney, the parties discussed the threat of Ample's being padlocked or otherwise closed because of Cerone's judgment. Spalding denied ever discussing the move personally with the Bank or seeking its permission to move. He testified that his attorney notified him to start moving the equipment upon the advice and direction of the

Bank's attorney. Two witnesses testified that Spalding told them of his intention to move the equipment and of the Bank's agreement to the plan. Acker testified that early in June 1970, when plaintiff's attorney made inquiry of him, he denied having any knowledge of the move of Ample's equipment and machinery to Spalding Manufacturing. However, Acker further testified that he had in fact agreed to the move of the equipment and its use by Spalding and Spalding Manufacturing. At the end of June 1970, the Bank received a payment from the sale of a piece of equipment which was applied on the original loan.

## I.

Initially, the Bank contends that the cause of action herein, if any, belongs to the corporation, Ample, which is not a party to these proceedings, and that plaintiff is not entitled to maintain the present action or to obtain relief in his own behalf. Where there is no showing that plaintiff himself had been injured in any capacity other than in common with his fellow stockholders, the cause of action belongs to the corporation (see *In re Possession & Control of Knight* (1965), 60 Ill. App. 2d 457, 208 N.E.2d 679), and a stockholder may not seek relief on his own behalf. However, this general principle has no application where the wrongful acts are not only against the corporation but are also violations of a duty arising from a contract or otherwise, and owed directly by the wrongdoer to the stockholders. (*Eldred v. Ripley* (1901), 97 Ill. App. 503.) A suit brought by a stockholder upon a personal claim is by its nature distinguishable from a proceeding to recover damages or other relief for the corporation. (See *Duncan v. National Tea Co.* (1957), 14 Ill. App. 2d 280, 144 N.E.2d 771.) Not every allegation of wrongdoing is a Simon-pure charge of individual injury, but a court must preliminarily determine if the "gravamen" of the pleadings states injury to the plaintiff upon an individual claim as distinguished from an injury which indirectly affects the shareholders or affects them as a whole. *Gieselmann v. Stegeman* (Mo. 1969), 443 S.W.2d 127.

In the instant case, plaintiff's initial complaint named Ample as a defendant. The appearance and answer filed by Spalding, Burke, Jaros and Spalding Manufacturing also included Ample which had been served with summons. Subsequently, all of the parties agreed to an order dismissing Ample. Plaintiff's amended complaint did not include Ample as a party; furthermore, neither complaint contained any allegations that plaintiff commenced the action or sought relief on behalf of Ample. Here, the appropriation of the stock ownership, assets, good will and customers of Ample has caused injury both to the corporation and to plaintiff individually as a stockholder. (See *Fried v. Easton* (Fla. App.

1974), 293 So. 2d 87.) Although the amended complaint sets forth a direct injury to the corporation, the gravamen of the complaint is the injury to the plaintiff. Sufficient facts of an ultimate and direct injury to plaintiff are set forth, and he may properly maintain the action in his own behalf.

## II.

Spalding and Spalding Manufacturing contend that plaintiff failed to prove any conduct on their part to sustain the finding that Spalding acted fraudulently, in that all action taken in removing the equipment and removing plaintiff as an officer was done pursuant to Spalding's belief that he was sole stockholder of Ample. Plaintiff's action is predicated in Count I on fraud, and in Count II on conspiracy and agreement to defraud.

In Illinois there is no general rule for determining what facts constitute fraud, and whether or not it is found depends upon the special facts of each particular case. (*Majewski v. Gallina* (1959), 17 Ill. 2d 92, 160 N.E.2d 783; *Citizens Savings & Loan Association v. Fischer* (1966), 67 Ill. App. 2d 315, 322, 214 N.E.2d 612.) "It may be based on concealment; on fraudulent devices; on a wilful, malevolent act directed to perpetrate a wrong to the rights of others; unlawful appropriation of another's property by design, or conduct that operates fraudulently on the rights of others, and is so intended. In short, it comprises all acts, of omissions and concealments, including breach of legal or equitable duty, trust or confidence, resulting in injury to another." *Illinois Minerals Co. v. McCarty* (1943), 318 Ill. App. 423, 435, 48 N.E.2d 424; *Fairfield Savings & Loan Association v. Kroll* (1969), 106 Ill. App. 2d 296, 302, 246 N.E.2d 327.

In the memorandum agreement of July 3, 1960, executed by Spalding and plaintiff, Spalding agreed to a one-half ownership in Ample and to jointly conduct its business and all other matters pertaining to Ample, and in effect, agreed to operate Ample as equal partners. A fiduciary relationship exists between partners and each is bound to act in the utmost good faith with the other. (29 Ill. L.&Pr. *Partnership* §71, at 318 (1957).) Spalding was also an officer of Ample and thereby further occupied a fiduciary relationship to the corporation and to plaintiff as its shareholder. As such, he was not permitted to appropriate corporate property or use corporate property for his own individual purposes. (See *Kerrigan v. Unity Savings Association* (1973), 11 Ill. App. 3d 766, 297 N.E.2d 699, *aff'd in pt., rev'd in pt. on other grounds,* 58 Ill. 2d 20, 317 N.E.2d 39.) Furthermore, when a corporate officer in a fiduciary relationship obtains an interest in property adverse to that of the cor-

poration, the burden rests on him to prove by clear and convincing evidence that he has exercised good faith. *Liddell v. Smith* (1965), 65 Ill. App. 2d 352, 213 N.E.2d 604.

Plaintiff and Spalding were associated in 1959 and each then owned 75 shares of Ample. In 1965, Spalding sold his interest to plaintiff and his certificate for 75 shares was returned to Ample as treasury stock. In 1968, Ample borrowed $60,000 through the Colonial National Bank wherein James Cerone, a friend of the plaintiff's and part-time salesman for Ample, pledged his home to Colonial, and Ample in turn pledged to him the 75 shares of treasury stock as security. Following discussions between plaintiff and Spalding which began in March 1969, a meeting was held on July 3, 1969, between plaintiff, Spalding and Cerone. On that date plaintiff and Spalding executed the handwritten agreement stating that Spalding had purchased one-half ownership in Ample and would contribute necessary funds to continue its business, and also that the business and all other matters of Ample would be conducted jointly by plaintiff and Spalding. Also on that date plaintiff delivered to Spalding his certificate for 75 shares in Ample, endorsed in blank by plaintiff.

Spalding testified that he became the owner of plaintiff's stock on July 3, 1969, and that plaintiff agreed Spalding could also purchase the treasury stock held by Cerone as a pledge, when redeemed. He claims that he did so on September 18, 1969, by discharging the Colonial loan and thereby became sole stockholder of Ample. However, plaintiff testified that at the meeting in July 1969, Spalding had agreed to assist Ample in its financial problems and to pay off the Colonial loan. He stated that Spalding was to receive the 75 shares of treasury stock when the Colonial loan was paid and after the treasury stock had been redeemed from the pledge to Cerone. Plaintiff contends that when Spalding initially advanced $10,000 to Ample, Spalding then received plaintiff's certificate to hold only as security until the treasury stock was subsequently redeemed. When the treasury stock was redeemed, plaintiff did not worry about the failure of Spalding to return his certificate because of his reliance upon their written agreement of July 3, 1967. It was undisputed that the Colonial loan was paid off with funds produced by a sale of certain machinery of Spalding's as well as certain machinery of Ample's. After the stock was redeemed Spalding continued to hold plaintiff's stock as security until Spalding's loans were repaid by Ample. It was stipulated that Spalding advanced a total of $38,000 to Ample, all of which had been entered on Ample's records as a loan and in no instance as an investment.

The testimony as to the execution of the certificate for the entire 150 shares of Ample on November 10, 1969, is also conflicting. Plaintiff

testified that he did not sign the certificate, contrary to the testimony of Spalding and a handwriting witness. The accountant, Schwartz, testified that at the request of Spalding he prepared the certificate although this was not his function. He did not see plaintiff sign the certificate and was unable to state that plaintiff acknowledged such signature. The certificate which was introduced in evidence had been torn completely in two and taped together. Spalding testified that Schwartz tore it while removing it from the stock book. However, Schwartz expressly denied having done so.

Although Spalding claimed at trial that he had been the owner of all the Ample stock since September 18, 1969, evidence was presented that he thereafter continued to represent that he and plaintiff were each half owners of Ample. Peter Bartels testified that in his presence while in the office of Spalding's attorney in March of 1970, Spalding advised the attorney that plaintiff had not signed the agreement prepared in January and asked what would happen to plaintiff's stock in Ample in case of death. Upon being told that it would go to plaintiff's wife, Spalding directed the attorney to prepare an agreement to get plaintiff out of Ample. Gay Burke, who was Spalding's daughter and secretary for Ample from December 1969 through May 1970, testified that plaintiff and Spalding always referred to themselves as partners and that it was not until May 1970 when the 150-share certificate was produced that she first heard that her father claimed ownership of all the Ample stock.

The record here supports the finding that Spalding was not the sole stockholder of Ample, but that plaintiff and Spalding were each owners of one half of stock and interest and that between themselves they intended and acted as joint venturers or partners in the conduct of Ample. Spalding, as a corporate officer, joint venturer or partner, owed a fiduciary obligation to plaintiff as owner of one half of the stock and interest in Ample, to act honestly and with the utmost good faith. Spalding violated his fiduciary obligation and duty to plaintiff in converting the assets and control of Ample to benefit himself and his solely owned Spalding Manufacturing Company. The latter company was used to participate and cooperate in the perpetration of the fraud upon plaintiff, and in fact, benefited directly in receiving the entire assets for its use. The finding that Spalding and Spalding Manufacturing engaged in a deliberate and malicious scheme to breach the fiduciary obligation, defraud the plaintiff, and divert the business is sufficiently supported by the evidence.

### III.

The Bank contends that the evidence fails to show that it had any knowledge of or participated in a scheme by Spalding to breach his

fiduciary duty to plaintiff and that there was therefore no basis to hold the Bank liable for the acts of Spalding. The Bank argues that it had no knowledge of the ownership in Ample, of the existence of any stock certificates, or of any transactions between plaintiff and Spalding and Cerone. The Bank, however, does not deny that it cooperated with Spalding in effecting the transfer of Ample's assets to Spalding Manufacturing, but maintains that its actions were legally proper and designed to protect its interests as a secured creditor of Ample.

The underlying theme of plaintiff's complaint and the crux of his argument are that as a result of the transfer of its assets Ample became insolvent and unable to meet its obligations, and that plaintiff suffered direct injury thereby. Civil conspiracy giving rise to a cause of action is a combination of two or more persons to accomplish a concerted action, either a lawful purpose by unlawful means or an unlawful purpose by lawful means. (*De L'Ogier Park Development Corp. v. First Federal Savings & Loan Association* (1972), 6 Ill. App. 3d 807, 286 N.E.2d 583.) In a civil case the wrongful act alleged to have been done in pursuance of a conspiracy, and not the fact of the conspiracy itself, is the gist of the action for damages; the charge of conspiracy is merely an aggravation of the alleged wrongful acts and serves the purpose of associating all the defendants with the acts done and declarations made by any of the defendants pursuant to the conspiracy. (*B. R. Paulsen & Co. v. Lee* (1968), 95 Ill. App. 2d 146, 151-52, 237 N.E.2d 793.) As aptly stated in *Young v. Hansen* (1969), 118 Ill. App. 2d 1, 7, 249 N.E.2d 300, "By its very nature, a conspiracy, if one exists, normally precludes the one who is its object from being in a position to charge, with complete particularity, the details of the conspiracy." The court, in *Majewski v. Gallina* (1959), 17 Ill. 2d 92, 99, observed that while fraud is never presumed, a conspiracy to defraud is rarely susceptible of direct proof, but nearly always comes from the nature of things, and is established by circumstantial evidence and legitimate inferences arising therefrom which depend largely on the common-sense knowledge of the motives and intentions of men in like circumstances. At page 100, the court further stated that fraud may be inferred from the nature of the acts complained of, the individual and collective interest of the alleged conspirators, the situation, the intimacy and relation of the parties at the time of the commission of the acts, and generally all the circumstances preceding and attending the culmination of the claimed conspiracy. The court, in concluding that the acts of conspiracy can be properly estimated only when connected with all the surrounding circumstances, quoted from *People v. Small* (1925), 319 Ill. 437, 449, 150 N.E. 435:

"It is seldom that any one act, taken by itself, will establish a

conspiracy, but when taken in connection with other acts it may appear clearly that the series of wrongful acts result from concerted and associated action. Considered separately the acts of a conspiracy are rarely of an unequivocally guilty character, and they can be properly estimated only when connected with all the surrounding circumstances."

A conspiracy may be inferred from circumstances; if the parties by their acts pursue the same object by common means, one performing one part and the other another, the natural deduction from such proof is that they were engaged in a conspiracy to effect that object.

Although contending that they had no knowledge of the ownership of Ample, the Bank in its brief in this court admits that two of its principal officers had direct contact and dealings with Spalding and with plaintiff on behalf of Ample. It there argues that its loan officer, Lazier, was never told that plaintiff had any ownership in Ample although he assumed that plaintiff and Spalding were partners; further, that its president, Acker, did not know whether plaintiff had an ownership interest in Ample, although he also assumed so. Moreover, the evidence discloses that on October 30, 1969, the Bank approved and made an installment note loan for $127,500. The note was executed by Ample as a corporation, secured by its corporate assets, and because the Bank assumed that Spalding and plaintiff had ownership interests in Ample, it required both of them to sign the note as personal guarantors. Ample opened and maintained two corporate checking accounts and filed corporate resolutions and financial statements with the Bank. A further loan of $15,000 was made on Ample's demand note in April of 1970. On May 15, 1970, plaintiff's attorney, by telephone and confirming letter of the same date, advised the Bank that if it cashed any of Ample's checks without plaintiff's signature it would do so at its own peril. The foregoing was sufficient to establish knowledge in the Bank that Ample was a corporation, that the ownership interest would be evidenced by certificates issued to its stockholders, and that plaintiff had an ownership interest and was further interested as a personal guarantor of Ample's corporate obligations to the Bank and also in the assets pledged as security for the loan.

The Bank argues that its actions were lawful and designed to protect the Bank's interest as a secured creditor. The further argument, that it had a right to declare Ample in default under the security agreement when in good faith it deemed itself insecure, was not raised in the trial court and we hold that it may not be so raised here for the first time. (See *Woman's Athletic Club v. Hulman* (1964), 31 Ill. 2d 449, 202 N.E.2d 528.) In any event, the Bank did not declare a default. Although

the Bank does not contend that it took or seized portions of the collateral, it argues that it had a right to condone and participate in the transfer of its collateral from Ample's premises in Franklin Park, Illinois, to the premises of Spalding and Spalding Manufacturing in Addison, Illinois, and in particular, to protect Ample from a levy on the Cerone judgment. Ample had in the past made regular payments to the Bank but the Bank relied upon Spalding's representation that Ample could not meet its next payment. The judgment of Cerone for $13,750 was minimal compared to an approximate value of $225,000 of assets which were transferred, and also as compared to the costs of moving which were shown to exceed the amount of the judgment. Spalding, as found by the court, continued to draw a large salary, and with the cooperation of the Bank diverted funds from Ample to his own benefit. The Bank continued to cooperate with Spalding for his and Spalding Manufacturing's own use and benefit, notwithstanding that it assumed that plaintiff had an ownership interest in Ample, that it had been notified not to cash Ample's checks without plaintiff's signature, and that it knew plaintiff was directly interested as a guarantor in the collateral pledged to secure Ample's note to the Bank. The Bank, through its officers, authorized and permitted Spalding to move and convert Ample's machinery and equipment for his and Spalding Manufacturing's own use and benefit, thereby terminating Ample's further operations; to sell various items of equipment without notice to plaintiff; and to cash and certify checks payable to Ample and withdraw Ample's funds to his own order and use without plaintiff's signature.

■■ Although it may have been the Bank's intention to protect the value of its security interest in the equipment and machinery at whatever cost and by whatever means then available and although Spalding may have intended the action to be a part of a greater and more encompassing scheme, we cannot say that the evidence fails to establish a "knowing co-operation on their part in the alleged unlawful enterprise," namely, the transfer of machinery, equipment and assets in derogation of Ample's and plaintiff's rights. (*Tribune Co. v. Thompson* (1930), 342 Ill. 503, 530, 174 N.E. 561.) Furthermore, the Bank breached its duty to treat the collateral held by it as a security interest in such a manner that it would not violate plaintiff's rights on his personal guarantee. (*Buschmann v. Professional Men's Association* (7th Cir. 1969), 405 F.2d 659; *Barrett v. Shanks* (1943), 382 Ill. 434, 47 N.E.2d 481.) At the least, the Bank's acts indicated such "gross negligence as to indicate a wanton disregard of the rights of others." (*Consolidated Coal Co. v. Haenni* (1893), 146 Ill. 614, 628; *Rauwolf v. Travelers Indemnity Co.* (1974), 20 Ill. App. 3d 226, 313 N.E.2d 504.) The Bank had been advised by Spald-

ing that he planned to remove plaintiff as an officer shortly before the moving of the equipment. The Bank was notified that a dispute had arisen between the parties whom the Bank had at all times assumed to be the owners. Taken in connection with all the other acts and circumstances in evidence, it clearly appears that the series of wrongful acts resulted from the concerted and associated actions of the defendants. The Bank participated and cooperated with Spalding in accomplishing a common objective, the removal of plaintiff as an officer and the appropriation and conversion of the assets of Ample to the use and profit of Spalding and Spalding Manufacturing. We therefore conclude that the finding of the trial court that the Bank cooperated with Spalding in the scheme to breach his fiduciary obligation and to defraud plaintiff is supported by clear and convincing evidence.

## IV.

The Bank contends that the award by the trial court of compensatory damages was contrary to the manifest weight of the evidence. It argues that Ample was insolvent and would have been unable to pay its obligations under any circumstances.

The trial court found that plaintiff's actual damages consisted of the following items which, but for the fraudulent transfer of Ample's assets and the closing of its business operations, would have been paid by Ample: the loan owing him from Ample of $27,418; wages due him from Ample of $4,200; and his personal guarantee to Central Steel & Wire upon Ample's open account of $8,395.66. The record reflected that Ample's financial condition had improved considerably and that it was making a profit in excess of $60,000 a year. The account of Central Steel & Wire was being paid on a monthly basis and the loans due Spalding were being paid at $400 per week.

Defendants particularly argue that the award of actual damages should be reduced by elimination of the $8,395.66 due on plaintiff's guarantee to Central; however, the evidence supports the inclusion of this item in the award of damages. A copy of plaintiff's guarantee was admitted into evidence and plaintiff testified that Central had made a demand for payment. It was further stipulated that a claim had been made by Central against Ample in the latter's banruptcy proceedings. The facts indicate that there was no likelihood of recovery against Ample.

■■ The evidence supports the trial court's finding that because of the acts of the defendants Ample was rendered insolvent and thereafter became bankrupt, rendering plaintiff liable on his guarantee to corporate creditors and rendering uncollectible his claims for monies loaned and wages due him from Ample. The trial court did not err in concluding

that the obligations due plaintiff and Central Wire & Steel would have been paid but for the wrongful acts of the defendants in transferring Ample's assets and causing termination of its operation.

## V.

Defendants further contend that there is no basis for the award of punitive damages. Punitive damages may be properly awarded where the defendants' actions are accompanied by aggravated circumstances such as wantonness, willfulness, malice, fraud, oppression, violence and recklessness. (*Blivas & Page, Inc. v. Klein* (1972), 5 Ill. App. 3d 280, 282 N.E.2d 210; 15 Ill. L.&Pr. *Damages* §132 (1968).) The allowance of punitive or exemplary damages is a matter within the court's discretion to determine, and such determination will not be disturbed in the absence of an abuse of discretion. *City of Chicago v. Shayne* (1964), 46 Ill. App. 2d 33, 38, 196 N.E.2d 521.

■■ Defendants argue that there is no evidence of aggravation or malice which is necessary as a basis for the award of punitive or exemplary damages. The argument must fail. We have hereinbefore concluded that the actions of Spalding in violating his fiduciary obligations to plaintiff were fraudulent, and that the actions of the Bank constituted a wanton disregard of the rights of the plaintiff. Under the facts and circumstances in the instant case, the award of punitive damages was not an abuse of discretion by the trial court.

## VI.

■■ Defendants contend that the judgment rendered against them is contrary to the manifest weight of the evidence. We disagree. The facts amply support the court's findings that the plaintiff's stock was converted; that he was deprived of his stock ownership, control and right to receive compensation as a director and officer of Ample; that because of the defendants' acts the corporation was rendered insolvent and declared bankrupt, thereby rendering plaintiff liable on his guarantees to corporate creditors and rendering worthless his claim against the corporation for wages and for moneys loaned to Ample. In *Illinois Rockford Corp. v. Kulp* (1968), 41 Ill. 2d 215, 242 N.E.2d 228, a 50-percent stockholder was found liable to plaintiff, the other 50-percent owner, for breaching his fiduciary relationship. In *Goodrich v. Malowney* (Fla. App. 1963), 157 So. 2d 829, the same result obtained for the same reason when the stockholder-director-president sued the directors and officers for conversion of his stock and for damages as the result of his ouster as an officer and director of the corporation. In a two-man corporation stockholders owe each other the duty to deal fairly, honestly and openly. (*Helms v.*

*Duckworth* (D.C.C. 1957), 249 F.2d 482.) A third party may be held liable for damages which are the direct result of its wrongful actions. See *Barrett v. Shanks* (1943), 382 Ill. 434, 47 N.E.2d 481; *Dale v. City Plumbing & Heating Supply Co.* (1965), 112 Ga. App. 723, 146 S.E.2d 349; *Sacks v. American Fletcher National Bank & Trust Co.* (Ind. 1972), 279 N.E.2d 807; and *Buschmann v. Professional Men's Association* (7th Cir. 1969), 405 F.2d 659.

The facts in the record on appeal amply support the judgment entered by the trial court, and we cannot here say that it is contrary to the manifest weight of the evidence. See *Willis v. Rich* (1964), 30 Ill. 2d 323, 196 N.E.2d 676; *Ross v. 311 North Central Avenue Building Corp.* (1970), 130 Ill. App. 2d 336, 264 N.E.2d 406.

## VII.

Plaintiff has cross-appealed, contending solely that the trial court's denial of additional damages for the loss of his half ownership in Ample was contrary to the manifest weight of the evidence. Prior to the entry of the written decree the trial court orally stated, in pertinent part:

"Value of one-half ownership of Ample Tool in the amount of $205,000 was prayed for. The value of Ample Tool was not supported by the proof, the value under the proof here being nebulous. The company is now in bankruptcy.

Proof of its business at the time of the transfer of the assets was not convincing to me beyond a zero or even minus net worth. The past history of the corporation was one of both success and failure.

The evidence did not satisfy this Court that Ample Tool was about to embark on a period of prosperity and great profit."

In the written decree subsequently entered the trial court made a finding pertinent to plaintiff's contention that "the evidence was not sufficient to establish a value for plaintiff's half ownership of Ample."

It is not here contested that an action for conversion may be maintained and that recovery may be had upon proper proofs. (See *Gorham v. Massillon Iron & Steel Co.* (1918), 284 Ill. 594, 120 N.E. 467; and *Goodrich v. Malowney* (Fla. App. 1963), 157 So. 2d 829.) As stated in *Gorham* (284 Ill. 594, 603):

"In arriving at the actual value of the stock appellees were permitted to prove, and the court took into consideration, the value of appellant's assets, the amount of its liabilities and its earning power for a number of years prior to the conversion. As the stock admittedly had no market value, this was a proper method to pursue to determine the actual value of the stock. [Citation.]"

In determining the propriety of the decree a reviewing court is not justified in disturbing the findings unless they are manifestly and palpably wrong or against the weight of the evidence. *Ross v. 311 North Central Avenue Building Corp.* (1970), 130 Ill. App. 2d 336, 264 N.E.2d 406.

Joseph McCauley testified on behalf of plaintiff. He was president of Quickserv Die Supplies which manufactured and sold the die sets and related accessories to the tool and die industry. He was engaged in the business since 1955 and was frequently consulted for management assistance and opinions in the industry for which Chicago is a major area. He had known plaintiff and Spalding since 1960 when they were originally partners in Ample. Before Spalding returned in July 1969, he had considered investing in Ample and had occasion to then study its business, including an inspection of its premises, financial reports, machinery, equipment, and the nature of work it did. At that time he concluded that the value of the machinery and equipment was about $200,000, not including perishable tools which he additionally valued between $20,000 and $25,000. However, he did not then invest in Ample because Spalding made the investment before McCauley reached a decision. After Spalding returned to Ample, McCauley had business discussions with him and plaintiff on behalf of Quickserv which was a major creditor of Ample prior to the time Ample was closed. The three men met in July or August of 1969 when the indebtedness due Quickserv was $8,000. Shortly thereafter Spalding pointed out to McCauley that Ample had its best month in August 1969 when its sales were over $80,000. Ample made monthly payments of $400 on the indebtedness which was reduced to $6,400. Ample was extended open credit by Quickserv on a regular account and agreed to keep current upon terms which were kept through February of 1970. In July or August of 1969, Spalding told him that he had prospective purchasers for Ample and that his asking price was in excess of $400,000.

McCauley further testified that he had bought two other companies which engaged in the general type of business as Ample. Prior to testifying, he examined the financial records of Ample as prepared by Schwartz for the period of July 1969 through April 1970. He stated that the balance and income statements indicated Ample lost $14,300 in 1968, which was a tough year for the industry in the Cook County area; $57,600 in 1969; and $66,710 for the first 4 months of 1970. The records for March 1970 showed a profit of $9,630 on sales of $46,600, and for April a profit of $6,098 on sales of $37,660. In the last 8 months of the 1970 fiscal year, ending February 28, 1970, the records showed a profit of $34,412 and a loss in excess of $30,000, which profit he considered

just fantastic. Before Spalding had returned Ample was unable to pay its bills, but changed dramatically during the period from July 1969 until April 30, 1970. The sales were to industrial giants such as Continental Can, Seeburg, Motorola and other first class companies which involved no credit risks to Ample. Based on the value of the dies produced by his company, McCauley estimated Ample received $30,000 a year from Continental and in excess of $40,000 per year from Seeburg. He stated that to determine an evaluation he customarily used a multiplier from 8 to 15 times earnings. In the case of Ample the earnings were in the vicinity of $53,000 a year. In his opinion, based primarily on its profit picture, the value of Ample on April 30, 1970, was in excess of $500,000, evaluated by the use of a multiplier of less than 10 times earnings.

Jack Schwartz testified on behalf of defendant Spalding. He was an accountant, although not a certified public accountant. He kept the records for Spalding Manufacturing prior to July 1969, at which time he became the accountant for Ample. In July 1969, he prepared a financial statement for Ample for the first 4 months of the fiscal year which began March 1, 1969, based upon the prior books and records. The statement as of June 30, 1969, reflected assets of $220,000, liabilities of $367,000, and a deficit capital of $147,000. In his opinion, the stock of Ample had a negative book value and the company was worthless. The gross sales for the fiscal year ending February 28, 1969 were $460,626, and for the fiscal year 1969-70 the gross sales were $582,841. The gross sales for the month of March 1970 were $46,578, and there was a profit of $9,629. The gross sales for April 1970 were $37,657, and a profit of $6,098. The sales for May 1970 were $13,292, which was less than the average monthly sales. For the period from July 1, 1969, through February 28, 1970, there was a profit of $34,413. There was a net operating profit in excess of $50,000 for the full 10-month period in which Schwartz kept the books.

Admittedly, there was no established market value for Ample's stock. To arrive at the actual value of plaintiff's half interest it is therefore necessary to take into consideration the actual value of Ample's assets, the amount of its liabilities and its earning power prior to the transfer of its assets and close of its business. It is necessary to determine those values from the actual amounts as to the value of its assets, liabilities and earning power, rather than the amounts carried on its books. The evidence indicated that its machinery and equipment were carried on its books at $99,000, although the actual value was in excess of $200,000, exclusive of the small perishable tools additionally valued between $20,000 and $25,000. Ample's financial condition improved dramatically

for the period preceding the transfer of its assets. It was making a profit at the rate of $60,000 per year while making substantial payments on its past and current obligations, including those due Spalding and the Bank. Schwartz testified that there was an operating profit in excess of $50,000 for the full 10-month period in which he kept the books. This period included the month of May 1970, during which the funds and accounts of Ample were being diverted for the benefit of Spalding and Spalding Manufacturing. Gross sales for the 1969-1970 fiscal year were $582,841. The gross sales for the previous year, ending February 28, 1969, were only $460,626. Schwartz, as a basis for his opinion, stated that he did not have knowledge as to the actual value of the machinery and equipment of Ample and did not include anything for good will. The only inventory he included was that of work in progress. The evidence disclosed that in the final days of the period the purchase orders were being reissued at Spalding's request to Spalding Manufacturing. In Schwartz's opinion, the stock was valueless insofar as the books were concerned. McCauley, who qualified as an expert in the industry and type of business conducted by Ample was fully conversant with its operations.

The rule that the findings of a trial court sitting without a jury will not be disturbed unless manifestly erroneous is applicable to the assessment of damages. (*Schatz v. Abbott Laboratories, Inc.* (1972), 51 Ill. 2d 143, 281 N.E.2d 323; *De Koven Drug Co. v. First National Bank* (1975), 27 Ill. App. 3d 798, 327 N.E.2d 378.) We have previously concluded that Ample's financial condition had improved considerably during the period after June 1969. Although Ample ultimately went into bankruptcy, it was not until 2½ months after Spalding had transferred its assets and terminated its operations. Plaintiff is entitled to recover for the loss of his one-half interest in Ample as a going business. Considering the totality of the evidence presented, the finding that Ample had no value prior to the transfer of its assets is contrary to the manifest weight of the evidence. Therefore, that portion of the decree which found that the evidence was not sufficient to establish a value for plaintiff's half ownership in Ample which thereby denied plaintiff additional damages therefor is reversed and the cause is remanded to the trial court to determine the actual value of Ample prior to the transfer of its assets and to award additional damages to plaintiff against defendants in an amount equivalent to one-half of the actual value so determined.

## VIII.

Finally, defendant Spalding in his separate appeal contends that the order finding him in contempt of court is defective and must be vacated

because of its failure to set forth fully, clearly and specifically the facts from which the allegedly contemptuous conduct arose. He further argues that the record fails to disclose a basis for the court's conclusion that he testified falsely and that the court erred in failing to afford him the right to a jury trial, and that the order therefore be reversed. The order entered by the trial court stated:

> "This matter coming on to be on the trial call of this Court, and the Court finding that during the trial of this cause, defendant Bruce Spalding committed perjury in his testimony before this Court, and the Court finds that said conduct of said defendant constitutes contempt of this Court, and the Court being otherwise fully advised in the premises:
>
> It is ordered that defendant Bruce Spalding is hereby held to be in contempt of this Court.
>
> It is further ordered that Bruce Spalding shall, within two weeks after the date of this order, pay to the clerk of this Court, by certified or cashier's check, the sum of $1,000.00 as and for a fine for his contempt as aforesaid."

Initially, defendant Spalding relies upon the recent decision in *Kotowski v. Kotowski* (1971), 3 Ill. App. 3d 231, 233, 278 N.E.2d 856, for the requirement that the trial court enter a written order finding contempt and that the order must recite fully, clearly and specifically the facts from which the contempt arose in order to preserve a meaningful right of appeal. In *Kotowski* the court held that the order contained only conclusions from which the reviewing court could not determine whether an act of contempt was committed. Defendant's reliance upon the general rule is not totally misplaced. However, the court there specifically noted that no record or report of proceedings was available in the reviewing court.

In *People v. Baxter* (1971), 130 Ill. App. 2d 1111, 268 N.E.2d 256, and *In re Dunagan* (1967), 80 Ill. App. 2d 117, 225 N.E.2d 119, the reviewing courts held that although the contempt order should specify the facts from which the contempt arose, an examination of the report of proceedings which is incorporated in the record on appeal is proper to determine if the finding of contempt was appropriate. In the instant case, the order does not recite specifically the facts from which the contempt arose. However, since the record here on appeal contains the report of proceedings in the trial court, we may examine the record to determine whether the finding of contempt was properly supported. The adjudication for direct contempt must be reversed if it is not supported either by a proper order of contempt or an adequate record. *People v. Stufflebeam* (1974), 19 Ill. App. 3d 462, 465, 311 N.E.2d 601.

In *People v. Bialek* (1961), 31 Ill. App. 2d 281, 283, 175 N.E.2d 278, the court stated that where a witness is cited for direct criminal contempt for perjured testimony "it must be made to appear by the witness' own admission, or perhaps by unquestioned or incontrovertible evidence, that the testimony he gave was false." (See also *People v. Koniecki* (1961), 28 Ill. App. 2d 483, 171 N.E.2d 666.) The court in *Bialek* relied upon and quoted from *People v. Hille* (1915), 192 Ill. App. 139, as follows:

> " '* * * it must appear beyond a reasonable doubt from the personal knowledge of the court, or by admissions from the lips of the defendant himself in open court, and in the presence of the court, and from no other source whatsoever, that (1) the representations so made were false and untrue when made; (2) that the defendant knew of their falsity when he made them; and (3) that he made them knowing their falsity and with a wilful and malevolent intention of assailing the dignity of the court, or of interfering with its procedure and the due administration of justice. * * *' " 31 Ill. App. 2d 281, 284.

In the instant case the separate decree entered by the trial court in favor of plaintiff contained the finding, among others, that "The incredibility of this testimony was exceeded by SPALDING's outright perjury relative to the cashing of the Seeburg and Hollymatic checks—which were payable to AMPLE—by the confidential investigator Bloom, who turned the proceeds of those checks over to SPALDING personally." The trial court, in its oral findings prior to the preparation and entry of the written decree, stated:

> "This outlandish testimony is exceeded only by his [Spalding's] outright perjury in this Court relative to the Seeburg checks which were cashed by investigator Blum [*sic*] brothers and the proceeds turned over to Spalding less the $500.
>
> And I digress at this point to state that the finding I made that that amounted to contempt of court requires a hearing of no further evidence other than the testimony I heard what transpired within my ocular view and Spalding's—out of Spaulding's [*sic*] own lips he committed perjury here before me beyond peradventure of a doubt and it is only my high regard and consideration for Counsel that represents him that restrains me from imposing a jail sentence upon him."

The record on appeal shows that during Spalding's examination by plaintiff pursuant to section 60 of the Illinois Civil Practice Act (Ill. Rev. Stat. 1971, ch. 110, par. 60), he testified substantially as follows: At or about the time Ample's assets were moved from Ample's premises,

certain outstanding invoices were paid and all the checks payable to Ample were deposited either with the defendant Bank or Mid-America National Bank; Herbert Bloom was a personal friend to whom he sold a Cadillac owned by Ample; certain entries in Ample's books relative to checks payable to Ample were in error; one check from Seeburg Corporation in the amount of $1,609.33 was deposited in the defendant Bank; the proceeds of that check *may* have been used to pay Federal taxes and were not applied against the loan due to defendant Bank; no checks payable to Ample were deposited into a separate bank account unknown to anyone else and opened by Spalding. Spalding denied depositing other Seeburg checks payable to Ample in an account at the Civic Center Bank and Trust Company; he denied knowing who did deposit them in that bank; he could not remember having in his possession certain Seeburg checks which were payable to Ample; and he stated he did not know how they may have been deposited in the Civic Center Bank. Upon being shown three checks from Hollymatic Corporation payable to Ample, two of which were deposited in defendant Bank and one in the Civic Center Bank, he stated that he thought all three checks had been deposited in defendant Bank. Defendant Spalding denied that Herbert Bloom or anyone in his family did private investigation work for Spalding; that he *could have* issued checks to a private investigator, Mr. Bloom's brother. Spalding then stated that there were three Bloom brothers, Herbert, Jerry and Dave. He denied giving the Seeburg checks to the Blooms and stated that he *did not know* how the Blooms could have acquired them. He further testified that he *may* have had all five Seeburg checks and the three Hollymatic checks in his possession on July 16, 1970, the date that four Seeburg checks and two Hollymatic checks were deposited in the Civic Center Bank; he could not remember. Spalding also testified that checks payable to Ample and received by him were normally entered upon Ample's books, but that he did not see all of the checks as they came in.

Spalding further testified that he had no independent recollection of how the Seeburg and Hollymatic checks were deposited in the account of Confidential Agents. Upon the court's persistent inquiry and over objection of counsel that Spalding had no personal knowledge of the circumstances resulting in the deposit of the above checks in the account of Confidential Agents, Spalding stated that he *may* have given them to the Blooms to pay bills for Ample. Again upon persistent inquiry by the court as to whether or not Ample owed money to Bloom, Spalding stated that he *could not remember* and testified that he would have to check the records. It was later stipulated that Spalding received a check drawn upon the Confidential Agents account. It was made payable

to Spalding, with the words thereon "for even exchange" and endorsed by Spalding. The check was issued for $500 less than the total of the Seeburg checks and the Hollymatic check deposited in the Confidential Agents account at the Civic Center Bank. No further testimony was heard concerning the checks.

■ ■ Before a person can be found guilty of direct criminal contempt predicated on an admission of perjury, the admission of the witness that his testimony was false must be accompanied by an admission that it was *wilfully* false or the circumstances must be such that the court could so hold as a matter of law. (*People v. Bialek* (1961), 31 Ill. App. 2d 281, 296, 175 N.E.2d 278.) At most, Spalding admitted that he received the Confidential Agents check which had been drawn for $500 less than the total of the Seeburg and Hollymatic checks. As such, this is not tantamount to an admission that he wilfully testified falsely concerning the latter checks. Neither can we say that the record here contains unquestioned or uncontrovertible evidence affirmatively showing Spalding's testimony to be false. The record shows that the witness was, at most, uncertain as to the circumstances surrounding the deposit or cashing of the Seeburg and Hollymatic checks. We cannot conclude therefrom that he deliberately trifled with the court or was wilfully and intentionally contemptuous in his inconsistent statements. (See *People v. Koniecki* (1961), 28 Ill. App. 2d 483, 171 N.E.2d 666.) Furthermore, we are unable to determine what the trial court considered to be Spalding's false testimony. The facts are sufficiently different from those in *People v. Freeman* (1930), 256 Ill. App. 233, and *People v. Hadesman* (1921), 223 Ill. App. 219, in which the courts found sufficient evidence in the record establishing the testimony to be wilfully false. Here the record fails to disclose a basis for the court's conclusion that Spalding testified falsely. Accordingly, the order finding defendant Spalding in contempt of court and imposing a fine of $1,000 must be reversed. It is therefore unnecessary to consider the right to a jury trial.

## IX.

Accordingly, the order finding defendant Spalding in contempt of court and imposing a fine of $1,000 is reversed. Further, the decree of the circuit court of Cook County in favor of plaintiff and against defendant is affirmed, except that the finding therein that "[t]he evidence was not sufficient to establish a value for plaintiff's half ownership of Ample" is reversed and the cause remanded with directions to fix and determine the actual value of Ample prior to the transfer of its assets and to award plaintiff additional damages against defendant for one-half of the value so determined not inconsistent with this opinion.

Order reversed; decree affirmed in part, and reversed and remanded in part with directions.

DEMPSEY and McGLOON, JJ., concur.