**NORTHERN INDIANA STEEL SUPPLY COMPANY, an Indiana Corporation, Plaintiff,**

v.

**Anthony COZZI, d/b/a A.M. Cozzi Metals, Defendant.**

**No. 87 C 0199.**

United States District Court, N.D. Illinois, E.D.

Sept. 6, 1989.

---

Francis X. Grossi, Jr., Michael W. Zavis, Deborah A. Hill, Katten Muchin & Zavis, Chicago, Ill., for plaintiff.

John A. Dienner, Daniel J. Pierce, Daniel J. Pierce, P.C., Chicago, Ill., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ASPEN, District Judge:

Plaintiff Northern Indiana Steel Supply Company (NISSCO) brought this action for fraud and conspiracy to commit fraud against defendants John P. Cozzi, Jr., Anthony Cozzi, Frank Cozzi, Joseph Cozzi and A.M. Cozzi Metals (AMC). Having heard the testimony, reviewed the evidence and considered the parties' legal memoranda, we enter the following findings of fact and conclusions of law, pursuant to Fed.R. Civ.P. 52.[1] For the reasons stated in these findings and conclusions, we find that the defendants engaged in fraud and conspiracy to commit fraud and enter judgment

1. Any finding of fact which is properly a conclusion of law and any conclusion of law which is

for the plaintiff in the amount of $154,-879.90, plus statutory interest and costs.

## FINDINGS OF FACT

1. NISSCO is a Delaware corporation having its principal place of business in Michigan City, Indiana. NISSCO is engaged in the purchase, sale and processing of scrap metal.

2. NISSCO consists of two operating divisions, AMI Metals and Burns Baling. AMI Metals is an ordinary scrap yard located in Michigan City, Indiana. Burns Baling is a specialized scrap yard which is located on the property of Midwest Steel Division of the National Steel Corporation in Portage, Indiana. The primary function of Burns Baling is to convert large quantities of scrap metal into bales or bundles.

3. John P. Cozzi, Jr., Anthony Cozzi, Frank Cozzi and Joseph Cozzi are residents and citizens of Illinois who formed and, at all times relevant to this action, were principals of AMC.

4. AMC is a partnership having its principal place of business in Chicago, Illinois. At all times relevant to this action, AMC was engaged in the business of purchasing and selling scrap metal.

5. A "clip" is a piece of scrap material that is less than ¼ of an inch thick and greater than 12 inches in its other dimensions. Clips resemble sheets of scrap iron. They are frequently compressed into bales or bundles measuring approximately 24 inches by 24 inches by 60 inches long. A "black clip" is a particular type of clip, consisting of a premium grade of scrap material.

6. Burns Baling purchases metal clips from plants and dealers in the area and arranges for the delivery of these clips to its facility at the Midwest Steel site. Burns Baling then compresses these clips into bales or bundles, inventories the clips and then stores them on its premises for the purpose of future sales to steel mills.

properly a finding of fact is to be so considered.

7. In the ordinary course of its business, Burns Baling weighs each truck or railroad car delivering scrap materials.

8. In the ordinary course of its business, Burns Baling generates "weigh tickets" upon the delivery of scrap material into its facility at the Midwest Steel site. These weigh tickets identify the party from whom the material is to be received and reflect measurements of the loaded as well as unloaded weight of a truck or other conveyance delivering the material. The purpose of these weigh tickets is to calculate the net weight of scrap material received by Burns Baling.

9. At all times relevant to this action, Burns Baling was under the operation, supervision and control of Richard Wolfe ("Wolfe"), its President.

10. At all times relevant to this action, Syl Yagelski ("Yagelski") was the immediate subordinate of Wolfe. Yagelski had been terminated in November, 1985, but remained at the yard for several months thereafter.

11. At all times relevant to this transaction, Donna Hall ("Hall") was a weighmaster clerk employed by Burns Baling.

12. On or about January 2, 1986, Wolfe prepared or caused to be prepared Purchase Contract No. 8505 (Pltf. Ex. 1) which purports to provide for the purchase of approximately 1,000 gross tons of black sheet clips at a price of $75.00 per gross ton. This contract identifies Burns Baling as the purchaser and defendant AMC as the seller.

13. The January 2, 1986 Purchase Contract bears the signature of Wolfe, in his former capacity as President of Burns Baling. It further reflects acceptance on January 8, 1986 by the defendant John Cozzi, Jr., on behalf of the defendant AMC.

14. Neither the defendants, nor any entity acting on behalf of the defendants, delivered 1,000 gross tons of black clips to Burns Baling, as specified in the January 2, 1986 Purchase Agreement.

15. On January 7, 1986, Hall, at the instruction of Yagelski, began to generate numerous false inbound weigh tickets.

(Pltf. Ex. Nos. 3 and 4). These tickets purported to evidence deliveries of black clips to Burns Baling by defendant, AMC. Yagelski specifically instructed Hall to generate a sufficient amount of inbound weigh tickets so as to substantiate the fictitious receipt of 1,000 gross tons of black sheet clips within a 12–day time period. Hall was further instructed to indicate that these fictitious clips were delivered by defendant AMC.

16. Pursuant to Yagelski's instructions, Hall enclosed the customer's copy of each fictitious weigh ticket in an envelope addressed to Wolfe and sent them to Wolfe's office at NISSCO's Michigan City facility.

17. NISSCO accounting personnel correlated the fictitious weigh tickets with the January 2, 1986 Purchase Contract and authorized payment to defendant AMC for scrap metal clips which Burns Baling never received.

18. On or about January 29, 1986, Wolfe prepared or caused to be prepared Purchase Contract No. 8506 (Pltf. Ex. No. 2), which purports to provide for the purchase of approximately 1,000 gross tons of black sheet metal clips at a price of $75.00 per gross ton. The contract identified Burns Baling as the purchaser and defendant AMC as the seller.

19. The January 29, 1986 Purchase Contract provides that the black sheet clips were to be delivered by AMC to Burns Baling at the Midwest Steel site.

20. The January 29, 1986 Purchase Contract bears the signature of Wolfe, in his former capacity as President of Burns Baling. It further reflects acceptance on January 30, 1986 by the defendant John P. Cozzi, Jr., on behalf of defendant AMC.

21. Neither any defendant nor any entity purporting to represent the defendants delivered 1,000 gross tons of black sheet clips to Burns Baling, as specified in the January 29, 1986 Purchase contract.

22. Once again, at the instruction of Yagelski, Hall began to generate a group of false inbound weigh tickets. (Pltf. Ex. Nos. 5 and 6). These tickets purported to evidence deliveries of black clips to Burns

Baling by the defendant AMC. As instructed by Yagelski, Hall generated weigh tickets to substantiate the fictitious receipt of 1,000 gross tons of black clips from the defendant AMC.

23. In accordance with Yagelski's instruction, Hall mailed the customer copies of the fictitious weigh tickets to Wolfe at NISSCO's Michigan City facility.

24. NISSCO accounting personnel correlated this second set of fictitious tickets with the January 29, 1986 Purchase Contract. Payment was authorized by NISSCO to the defendant AMC for scrap metal clips which Burns Baling never received.

25. On or about January 14, 1986 and February 19, 1986, the defendants submitted to Burns Baling and NISSCO a series of false invoices (Pltf. Ex. Nos. 3, 4, 5 and 6) that corresponded with the January 2 and January 29 Purchase Contracts. These invoices list deliveries during January and February of 1986 totaling approximately 2,000 gross pounds of black clips.

26. AMC did not deliver the materials listed on these invoices.

27. In accordance with the purchase contracts, weigh tickets and invoices, NISSCO issued several checks payable to the defendant AMC. These checks (Pltf. Ex. 11) were issued in February and March of 1986 and totaled $154,759.90.

28. Each of these checks was endorsed by the defendant AMC and negotiated during February and March of 1986 at the Lawndale Trust & Savings Bank in Lawndale, Illinois.

29. On August 4, 1986, all physical inventory owned by Burns Balilng was weighed, resulting in a total of 2,922 gross tons less than the total reflected in the book inventory.

30. This court finds that the individual defendants, John P. Cozzi, Jr., Anthony Cozzi, Frank Cozzi and Joseph Cozzi, doing business as defendant AMC, entered into a scheme with Wolfe and Yagelski to defraud NISSCO. The defendants, together with Wolfe and Yagelski, created false documentation that gave the appearance that NISSCO had 2,000 gross tons of black

sheet clips from the defendant AMC. The goal, and ultimate result, of this scheme was to obtain a series of checks totaling $154,759.90 payable for materials which the defendants never intended to deliver to Burns Baling.

## CONCLUSIONS OF LAW

1. All of the parties are in agreement that Illinois law governs this diversity suit.

2. Under Illinois law, there are six elements of a cause of action for fraud. These are:

a) A false statement of material fact by the defendant;

b) Known or believed by the defendant to be false;

c) Intent to induce the plaintiff to rely on the statement;

d) Reliance by the plaintiff;

e) Justifiable reliance or the right to rely on the part of the plaintiff; and

f) Resultant damage to the plaintiff from such reliance.

*West v. Western Cas. and Sur. Co.,* 846 F.2d 387, 393 (7th Cir.1988) *Dixie–Portland Flour Mills, Inc. v. Nation Enterprises, Inc.,* 613 F.Supp. 985, 990 (N.D.Ill. 1985).

3. NISSCO has established all the elements of a cause of action for fraud. Defendants knowingly made a false statement of material fact when invoices were submitted to NISSCO claiming that the defendants had delivered 2,000 gross tons of black clips to Burns Baling. The very purpose of these invoices was to induce NISSCO to rely on the invoices and issue payment for materials which were not received. NISSCO relied on these invoices and issued checks to the defendants in the amount of $154,759.90. Plaintiff's reliance was justified, as these invoices correlated to weigh tickets and purchase contracts that created the appearance that a legitimate, actual delivery of materials had occurred. NISSCO sustained damage, as it paid for materials it never received.

4. The testimony proffered by defendants in contradiction to the evidence of fraud not to be credible.

5. Defendants' conduct was willful, wanton and knowingly fraudulent.

6. "The measure of damages in an action for fraud is determined from the loss to the plaintiff rather than from the gain to the defendant." *HGN Corp. v. Chamberlain, Hrdlicka, White, Johnson*, 642 F.Supp. 1443, 1451 (N.D.Ill.1986), citing *Martin v. Allstate Insurance Co.*, 92 Ill. App.3d 829, 835, 48 Ill.Dec. 316, 321, 416 N.E.2d 347, 352 (1st Dist. 1981). Accordingly, we find that plaintiff has been damaged in the amount of $154,759.90 due to its payments for scrap materials which were never received.

■ 7. Under Illinois law, "civil conspiracy giving rise to a cause of action is a combination of two or more persons to accomplish a concerted action, either a lawful purpose by unlawful means or an unlawful purpose by lawful means." *Zokoych v. Spalding*, 36 Ill.App.3d 654, 344 N.E.2d 805, 816 (1st Dist.1976) (citation omitted). *See also United States v. President*, 591 F.Supp. 1313, 1319 (N.D.Ill.1984).

8. "A conspiracy to defraud is rarely susceptible of direct proof, but nearly always comes from the nature of things, and is established by circumstantial evidence and legitimate inferences arising therefrom." *Zokoych v. Spalding*, 36 Ill.App.3d 654, 344 N.E.2d 805, 816.

9. Defendants combined with Wolfe and Yagelski for the specific and unlawful purpose of defrauding NISSCO. The direct and circumstantial evidence presented establishes an agreement between the defendants, Wolfe and Yagelski to create false documentation of a fictitious scrap metal transaction. The goal of this conspiracy was to induce NISSCO to issue funds for material which was never delivered.

10. Pursuant to this scheme, defendants prepared false invoices and submitted them to NISSCO for payment. In addition, the defendants accepted, endorsed, presented and deposited checks issued by NISSCO as a result of the fraudulent scheme. These actions constituted overt acts in furtherance of the conspiracy to defraud NISSCO.

11. Testimony proffered by the defendants is not credible.

12. Defendants willfully, wantonly and knowingly participated in a conspiracy to defraud NISSCO. As a result of this conspiracy, NISSCO sustained damages in the amount of $154,759.90.

13. Illinois law provides that punitive damages may be awarded in a fraud case in order to punish the defendant and deter future fraudulent conduct. The decision to award punitive damages is a matter of the court's discretion. *Obermaier v. Obermaier*, 128 Ill.App.3d 602, 83 Ill.Dec. 627, 470 N.E.2d 1047, 1053 (1st Dist.1984).

14. We find that, in light of the defendants' willful, knowing and wanton actions, punitive damages in the amount of $100.00 are appropriate [2] for the purposes of punishing these defendants and deterring the commission of like offenses.

## CONCLUSION

Accordingly, the Court orders that judgment be entered in favor of the plaintiff and against all of the defendants in the amount of $154,759.90 in actual damages, $100.00 punitive damages, for a total damage award of $154,879.90, plus statutory interest and costs. It is so ordered.

---

**2.** Although NISSCO was defrauded of $154,-759.90, the evidence shows that defendants probably received only $20,000.00 of this sum. Since as co-conspirators they are liable for the entire $154,759.90, a token award of $100.00 punitive damages is appropriate in this case.